639 So.2d 921 (1994)
Billy Cleveland FERGUSON, Sr.
v.
Linda Carr FERGUSON.
No. 92-CA-00058.
Supreme Court of Mississippi.
July 7, 1994.
*925 Aleita M. Sullivan, Mendenhall, for appellant.
Leonard B. Cobb, Ray & Cobb, Meridian, for appellee.
En Banc.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION
At issue in this domestic relations case is the division of marital property (both personal and real), alimony (both periodic and lumpsum), and future interests in retirement/pension plans. This Court has been in a transitory state regarding the division of marital assets. Our prior law adhered to a system of returning property to the spouse in whom title was held (separate property method); however, recent opinions have eroded adherence to that method of division. This Court has "long recognized that, incident to a divorce, the chancery court has authority, where the equities so suggest, to order a fair division of property accumulated through the joint contributions and efforts of the parties." Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990); Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990); Jones v. Jones, 532 So.2d 574, 580-581 (Miss. 1988); Clark v. Clark, 293 So.2d 447, 450 (Miss. 1974). With this opinion, this Court adopts guidelines for application of the equitable distribution method of division of marital assets.
Billy Ferguson, Sr., (Billy), appeals from a final judgment of divorce entered on November 12, 1991, by the Chancery Court of Newton County awarding a divorce to Linda Ferguson, (Linda), on the ground of adultery and denying Billy's counterclaim for divorce filed on the basis of habitual cruel and inhuman treatment. The Court affirms the granting of a divorce to the wife, together with custody and support of the minor child. With adoption of guidelines to aid chancellors in division of marital property under the equitable property division method, this Court reverses the award of marital assets and remands to the chancery court to reevaluate the marital division in light of these guidelines.

II. MARITAL PROPERTY DIVISION

A. Historical Background

States have devised various methods to divide marital assets at divorce, and approaches *926 have usually followed one of three systems. According to Stephen J. Brake, Equitable Distribution vs. Fixed Rules: Marital Property Reform and the Uniform Marital Property Act, 23 B.C.L.Rev., 761, 762 (1982), the separate property system, the equitable distribution system, and a system of fixed rules (community property) are the three systems reflected in American jurisprudence. Id. (citing Foster and Freed, Divorce, note 5, at 4050-51). According to Foster and Freed, Mississippi[1], Florida, South Carolina, Virginia, and West Virginia previously followed the separate property system, which was a system that merely determined title to the assets and returned that property to the title-holding spouse.
Our separate property system at times resulted in unjust distributions, especially involving cases of a traditional family where most property was titled in the husband, leaving a traditional housewife and mother with nothing but a claim for alimony, which often proved unenforceable. In a family where both spouses worked, but the husband's resources were devoted to investments while the wife's earnings were devoted to paying the family expenses or vice versa, the same unfair results ensued.
The flaw of the separate property system, however, is not merely that it will occasionally ignore the financial contributions of the non-titleholding spouse. The system ... is also unable to take account of a spouse's non-financial contribution. In the case of many traditional housewives such non-financial contributions are often considerable.[2] Thus, to allow a system of property division to ignore non-financial contributions is to create a likelihood of unjust division of property.
See Brake, supra at 765.
The non-monetary contributions of a traditional housewife have been acknowledged by this Court, and to some extent, case law has helped lessen the unfairness to a traditional housewife in the division of marital property.[3] The mechanism applied by this Court to prevent unfair division is the resulting trust. Jones v. Jones, 532 So.2d 574, 582 (Miss. 1988) (Prather, J., concurring).
Also, this Court has allowed lump sum alimony as an adjustment to property division to prevent unfair division. Reeves v. Reeves, 410 So.2d 1300, 1303 (Miss. 1982); Clark v. Clark, 293 So.2d 447, 449 (Miss. 1974); Jenkins v. Jenkins, 278 So.2d 446, 449 (Miss. 1973). The lump sum award has been described as a method of dividing property under the guise of alimony. Stephen J. Brake, supra at 766. See also, H. Clark, Domestic Relations, § 14.8 at 450 (1976). In Bowe v. Bowe, 557 So.2d 793, 794 (Miss. 1990), this Court acknowledged that a chancellor had the authority and discretion to divide the marital assets by awarding periodic or lump sum alimony, or both, or by dividing the personal property, or awarding the exclusive use and possession of the homestead. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss. 1993). The full development of our jurisprudence in this arena culminated in Draper v. Draper, 627 So.2d 302, 305 (Miss. 1993), in which this Court abandoned the prohibition against the chancery court's divestment *927 of title to real property, which was the last vestige of the separate property method of distribution of marital assets.
Thus, through an evolution of case law, this Court has abandoned the title theory method of distribution of marital assets and evolved into an equitable distribution system.[4]

B. Chancery Court Authority

Courts have acknowledged that the power and authority of the chancery court to award alimony and child support have been historically derived from the legal duty of the husband to support the family. As to division of marital assets, it is the broad inherent equity powers of the chancery court that give it the authority to act. General equity principles of fairness undergird this authority. That duty was codified in Miss. Code Ann. § 93-5-23 (Supp. 1993) as follows:[5]
When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody and maintenance of the children of the marriage, and also touching the maintenance and alimony of the wife or husband, or any allowance to be made to her or him, and shall, if need be, require bond, sureties or other guarantee for the payment of sum so allowed.
However, where proof shows that both parents have separate incomes or estates, the court may require that each parent contribute to the support and maintenance of the children of the marriage in proportion to the relative financial ability of each. (Emphasis added)
Of particular significance is the verbiage "any allowance ... to him or her."
Additionally, the statutory authority granted to the chancery court to award divorce on no-fault grounds and to approve the parties' agreement regarding marital property division or to make such division, on submission of that issue to the court by the parties, further undergirds the inherent equitable power of the chancery courts to address this issue of division of marital assets. The development of equitable doctrines is not foreclosed by these statutes. Under Draper, chancellors are empowered to address realty assets and to divest title, including that of the family home. In Draper, this Court said:
It is well-established by this Court that the chancery court has the authority to order an equitable division of property that was accumulated through the joint efforts and contributions of the parties. Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990). However, there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court. Id. at 691.
Id. at 305. In addition to the development of family law within our jurisprudence, there has been the advent of federal legislation into regulation of military and employee pension plans which has opened yet another arena in which state equity courts are empowered to address future interests and apply state law to pension plans, military retirement, and railroad retirement. Bowe, supra. This Court, therefore, holds that the chancery court is within its authority and power to equitably divide marital assets at divorce.

C. Vesting of Rights

The Court needs to address vesting in conjunction with the divesting of title to realty or personalty. This Court has held that a vested interest in a military retirement pension plan is a marital asset; however, "the spouse has no vested right in the serviceman's military retirement pension." Southern *928 v. Glenn, 568 So.2d 281, 283 n. 1 (Miss. 1990); Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990). As to the division of marital assets, this Court stated in Brown, 574 So.2d at 691 (citations omitted), that marital assets are not a source of vested rights. This Court stated:
The matter rather is committed to the discretion and conscience of the Court, having in mind all of the equities and other relevant facts and circumstances. (citations omitted) ... the term "vested" [] has no hard edged definition, no fixed and invariable legal meaning. "Vested" means different things in different contexts. (Citations omitted) ... vesting is quite different from a rule of discretion which allows a chancery court, incident to a divorce, to consider the relevant facts and circumstances and, where it is equitable and just to recognize a party's contributions to the accumulation of jointly held assets, to decree an equitable division.
Brown, 574 So.2d at 691. This Court adheres to the above principle that no right to property vests by virtue of the marriage relationship alone prior to entry of a judgment or decree granting equitable or other distribution pursuant to dissolution of the marriage. Thus the rights of alienation and the laws of descent and distribution are not affected by our recognition of marital assets. For the Court's definition of "marital assets," see Hemsley v. Hemsley, decided July 7, 1994, 639 So.2d 909.

D. Guidelines

This Court has previously promulgated guidelines in the awarding of periodic alimony. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss. 1993); Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss. 1992). Guidelines for lump sum alimony were specifically addressed in Tilley v. Tilley, 610 So.2d 348, 351-52 (Miss. 1992) and in Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988). Given the development of domestic relations law, this Court recognizes the need for guidelines to aid chancellors in their adjudication of marital property division. Therefore, this Court directs the chancery courts to evaluate the division of marital assets by the following guidelines and to support their decisions with findings of fact and conclusions of law for purposes of appellate review. Although this listing is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
*929 This Court cannot contemplate every situation that may present itself in future cases; therefore, the Court will address other questions as they arise, taking into consideration that fairness is the prevailing guideline in marital division. For example, interspousal gifts are not a part of this factual situation. Chancellors will have to determine for this Court's review whether an interspousal gift is a highly personal one or whether some type of property, i.e., stocks and bonds, may require something beyond a gift analysis. LaRue, 172 W. Va. 158, 304 S.E.2d at 335-36 (Neely, J., concurring).
There are some observations which need to be made in regard to division of marital assets. Initially, this Court notes that existing law regarding periodic alimony and child support is not altered. Upon dissolution of a marriage, the chancery court has the discretion to award periodic and/or lump sum alimony, divide real and personal property, including the divesting of title, and may consider awarding future interests to be received by each spouse. Additionally, homemaker contributions are not to be measured by a mechanical formula, but on the contribution to the economic and emotional well-being of the family unit. LaRue v. LaRue, 172 W. Va. 158, 304 S.E.2d 312, 322 (1983); 41 ALR 4th 445.
Some courts have held that equitable distribution of property has as its goal not only a fair division based upon the facts of the case, but also an attempt to finalize the division of assets and conclude the parties' legal relationship, leaving them each in a self-sufficient state, where the facts and circumstances permit total dissolution.
Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case. All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." LaRue, 172 W. Va. 158, 304 S.E.2d at 334 (Neely, J., concurring). Thus, the chancellor may divide marital assets, real and personal, as well as award periodic and/or lump sum alimony, as equity demands. To aid appellate review, findings of fact by the chancellor, together with the legal conclusions drawn from those findings, are required.
In the final analysis, all awards should be considered together to determine that they are equitable and fair. The Court now turns to the case before us for application of these principles.

III. FACTS
Linda Ferguson, age 44, and Billy Cleveland Ferguson, Sr., age 48, were married on April 15, 1967, and separated on May 13, 1991. Two children were born of this marriage. When the complaint for divorce was filed on May 21, 1991, the parties' daughter, Tamatha Ferguson, was 23 years of age and emancipated. Their son, Billy Cleveland Ferguson, Jr. (Bubba), was 14 years old and resided in the home with his parents in Chunky, Newton County, Mississippi.
During their 24 years of marriage, Linda worked both as a homemaker and as a cosmetologist/beautician. Billy, employed by South Central Bell as a cable repair technician for 24 years, installed and maintained local telephone service in the Chunky, Mississippi, area.
On May 21, 1991, Linda filed for divorce on the grounds of adultery and requested permanent custody of Bubba. Billy denied the adultery charge and counterclaimed for divorce based on habitual cruel and inhuman treatment. Billy also sought custody of his son, alleging that Bubba had expressed a desire to live with his father, and arguing that the court should respect the wishes of the child. No allegations were made that Linda was not a fit, suitable or proper parent to have custody of the child.
The chancellor denied Billy's request for divorce and awarded Linda: (1) a divorce on *930 the ground of adultery; (2) custody of Bubba and $300.00 a month in child support; (3) the marital home and its contents together with four acres of land comprising the homestead, title to the marital home to be divested from Billy and vested in Linda, debt free; (4) one-half interest in Billy's pension plan, stock ownership plan, and savings and security plan; (5) periodic alimony in the amount of $400.00 per month and lump sum alimony in the sum of $30,000.00 to be paid at the rate of $10,000.00 annually beginning on January 1, 1992; (6) attorney fees in the amount of $5,000.00; (7) health insurance through Bell South for as long "as the law allows," and (8) a lien on any and all property owned by Billy to secure the payments ordered by the chancellor.
The "Judgment of Divorce and Related Relief," entered November 12, 1991, specifically acknowledged that both parties had requested the Court to make an equitable division of marital property. Billy appeals all adjudications of the Court.

IV. ANALYSIS
Our scope of review in domestic relations matters is limited. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990).
In other words, "[o]n appeal this Court is required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." Newsom v. Newsom, 557 So.2d 511, 514 (Miss. 1990). This is particularly true "in the areas of divorce and child support." Nichols v. Tedder, 547 So.2d 766, 781 (Miss. 1989).

A. Adultery Statement, Tape Recording, and Deposition

Billy claims the chancellor erred in finding evidence sufficient to award a divorce to Linda on the grounds of his adultery. Billy also contends: (1) the sworn statement of his paramour was hearsay, improperly authenticated, and not produced during discovery; (2) the admission of a tape recording of conversations between Billy and the paramour was error because the recording violated federal law proscribing interspousal wire tapping and was not properly identified; and (3) the deposition should not have been admitted because it pertained to an incident that occurred nine years before trial and was irrelevant. The Court addresses these alleged evidentiary errors.
In establishing the charge of adultery, Linda Ferguson presented the sworn statement of the paramour, a tape recording of conversations between the paramour and Billy, and the direct testimony of the paramour which, if true, clearly established, via direct evidence, an adulterous relationship between Billy and the paramour. In the paramour's initial courtroom testimony, she denied having sexual relations with Billy Ferguson. The following day, at which time she was represented by counsel, Linda's lawyer asked if she desired to change her testimony from the testimony she had given under oath the previous day. The paramour responded affirmatively. She admitted that the testimony she had given the day before was false and testified that her prior written statement was correct.
Billy also assails the admissibility of the sworn prior statement of the paramour on the grounds of improper identification, nonproduction during discovery, hearsay, and lack of opportunity of Billy's lawyer to cross-examine the paramour. The only contemporaneous objection made to the statement by trial counsel was a hearsay objection. Therefore, other objections have been waived. Marshall v. Marshall, 205 So.2d 644, 646 (Miss. 1968).
The paramour's sworn statement was properly admitted as a prior inconsistent statement pursuant to M.R.E. Rule 613(b). In the case sub judice, the paramour testified at trial, her prior statement was inconsistent with her testimony, her prior statement was given under the oath, and Billy's attorney was given a fair opportunity to question her concerning her prior sworn and inconsistent statement. The statement was admissible only for impeachment, but the error was cured, however, because the paramour recanted, admitted the error and testified that the statement was true. Thus, the admission *931 of the statement as substantive evidence, while error, was harmless.
During the paramour's testimony, it was established she had made two tape recordings of her conversations with Billy Ferguson. Following her testimony that she was well aware the recording device had been attached to her telephone, defense counsel stated that, in that event, he had no objection to the legality of the tape recording. Any previous objection that may have been made was clearly withdrawn.
The same observation holds true for appellant's objection to the tape recording on discovery grounds. That objection, likewise, was withdrawn after defense counsel reviewed the wording of his interrogatories, especially number 27, which only required Linda, not a third party, to provide a description of the nature of each telephone conversation she recorded between her husband and any other person.
Finally, the deposition suggesting sexual misconduct years earlier was not presented as evidence of Billy's adultery, but was proffered and admitted as being relevant to the issues of child custody and moral unfitness. This deposition was admitted pursuant to Rule 32(a)(3)(D), M.R.C.P. which states that the deposition of a witness may be used if the court finds "that the party offering the deposition has been unable to procure the attendance of the witness by subpoena."
The charge of adultery was properly established by clear and convincing evidence, and this assignment is without merit. Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986).

B. Habitual Cruel and Inhuman Treatment

Billy contends the chancellor erred in denying him a divorce on the grounds of habitual cruel and inhuman treatment. He also complains that he was not permitted to question Linda pertaining to her alleged acts of adultery.
Billy's attempt to introduce testimony of alleged adultery committed by Linda was properly excluded by the chancellor because Billy failed to plead adultery as a part of the cruelty ground. Duncan v. Duncan, 417 So.2d 908, 910 (Miss. 1982); Seymore v. Greater Mississippi Life Ins. Co., 362 So.2d 611, 614 (Miss. 1978).
The standard applicable to a divorce sought on the ground of habitual cruel and inhuman treatment is found in Wilson v. Wilson, 547 So.2d 803, 805 (Miss. 1989), where we stated:
In years gone by, this Court consistently held that habitual cruel and inhuman treatment could be established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said a permanent condition.
See also Haralson v. Haralson, 483 So.2d 378, 379 (Miss. 1986); Stennis v. Stennis, 464 So.2d 1161, 1162 (1985); Gallaspy v. Gallaspy, 459 So.2d 283, 285 (Miss. 1984); Marble v. Marble, 457 So.2d 1342, 1343 (Miss. 1984).
Billy's proof in the case at bar falls short of that required by our decisions. No proof was offered, establishing that Linda had a habit of assaultive behavior or conduct which Billy reasonably feared or which had an adverse effect on his health. The chancellor properly denied Billy Ferguson a divorce from Linda on the ground of habitual cruel and inhuman treatment.

C. Child Custody

In his counterclaim for divorce, Billy requested custody of the minor child solely on the ground it was the preference of the child to live with him. Billy made no allegations that Linda was unfit. Linda, on the other hand, stated in her complaint that Billy was neither a fit, suitable, nor proper person to have permanent custody.
Bubba, the parties' 14 year old minor son, testified during trial he would prefer to live with his father. Billy contends that since the child had reached his twelfth birthday, our statutory law granted to him the privilege of *932 choosing the parent with whom he wanted to live.
Miss. Code Ann. § 93-11-65 reads, in its pertinent parts, as follows:
Provided, however, that if the Court shall find that both parties are fit and proper persons to have custody of the children, and that either party is able to adequately provide for the care and maintenance of the children, and that it would be to the best interest and welfare of the children, then any such child who shall have reached his twelfth birthday shall have the privilege of choosing the parent with whom he shall live.
In Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983), this Court reaffirmed "the rule that the polestar consideration in child custody cases is the best interest and welfare of the child." After application of the various evidentiary factors contained in Albright, including the moral fitness of the parties, the chancellor held "that it would be in the best interest of Billy Cleveland Ferguson, Jr. that the permanent custody ... be awarded to ... Linda Carr Ferguson."
Billy contends that he and Bubba had a good relationship and that he spent more time with Bubba than did his mother. Billy claims the relationship between Linda and Bubba had deteriorated, that she yelled at Bubba and made derogatory comments, and that she quit cooking and washing clothes for the child and his father.
There was proof, on the other hand, that Billy had (1) encouraged the child to ignore and disobey his mother; (2) allowed the impressionable fourteen year old to chew tobacco and dip snuff; (3) allowed the child to ride a four-wheeler without adult supervision; (4) purchased for his minor son, and allowed him to carry and shoot, unsupervised by an adult, a .357 magnum pistol; (5) kept his supply of pornographic movies in the child's bedroom; (6) told Bubba that he would buy Bubba a truck if Bubba stayed with him after the divorce; (7) belittled his wife in the boy's presence and encouraged his son to do the same. Bubba testified that if he had to live with his mother he would give her a chance to correct their problems but if he lived with his dad he could not give his mother a chance to correct any problems with her. The latter testimony strongly suggests the boy's relationship with his mother would seriously deteriorate if he were allowed to live with his father.
One of the prerequisites for invocation of § 93-11-65 is that both parents be fit. See Polk v. Polk, 589 So.2d 123, 130 (Miss. 1991). The chancellor found, as a fact, that Billy Ferguson was morally unfit to be a parent and awarded custody to Linda. We do not find this to be an abuse of judicial discretion.
The chancellor did not, under the facts of this case, abuse his judicial discretion in conducting his own interrogation of the child, who was subject to recross by the defendant's attorney. This finding is affirmed.

D. Child Support

Linda testified that, if the chancellor awarded her custody of Bubba, she was requesting that the court award her $350.00 a month in child support. The chancellor awarded child support to Linda in the amount of $300.00 a month. Billy claims the amount is excessive and that the chancellor was manifestly wrong, partly because there was no testimony from Linda as to what the child's basic, necessary living expenses were. Moreover, Billy submits the amount of child support awarded to Linda was in excess of 14% of his adjusted gross income, well above the statutory guidelines for one child set forth in Miss. Code Ann. § 43-19-101 (Supp. 1993).
In Smith, this Court addressed a similar complaint:
While the statutory guidelines are relevant and may be considered by a chancellor as an aid in determining child support awards, we have held that the specific need or support required is to be determined by a chancellor "at a time real, on a scene certain, and with a knowledge special to the actual circumstances and to the individual child or children." Thurman v. Thurman, 559 So.2d 1014, 1018 (Miss. *933 1990). See also Jellenc v. Jellenc, 567 So.2d 847 (Miss. 1990).
614 So.2d 394, 397 (Miss. 1993).
Although Billy argues to the contrary, there is testimony from Linda in the record concerning the child's basic needs and necessary living expenses for food, supplies, monthly utility bills, and the amount required monthly for clothes.
The chancellor followed the criteria found in Tedford v. Dempsey, 437 So.2d 410, 422 (Miss. 1983). The award of child support is a matter within the discretion of the chancellor and will not be reversed unless the chancellor was manifestly in error in his fact-findings and manifestly abused his judicial discretion.
Our review of the record persuades us that Billy will be able to support himself as well as pay child support to Linda in the amount of $300.00 a month for the support of his teenage son. Accordingly, we find the Chancellor was not manifestly in error and did not abuse his judicial discretion in awarding child support.

E. Equitable Division of Husband's Bell South Pension Plan, Stock, and Savings and Security Plan

In her complaint, Linda requested an adjudication that she was entitled to "one-half of all retirement benefits, profit sharing plan or other deferred compensation or stocks or bonds and pension plans to which the Defendant may be entitled, including, but not limited to, Bell South Corporation's Savings and Security Plan."
Billy Ferguson had a vested pension with Bell South, the total value of which was $800.45 as of October 24, 1991. As part of the equitable division of all marital property, the chancellor held Linda "shall be entitled to and be awarded fifty percent (50%) of the interest in the pension," valued at $400.20 as of October 24, 1991. A Qualified Domestic Relations Order (QDRO) was entered purporting to assign an interest pursuant to the Internal Revenue Code. 26 U.S.C.A. 414(p)(11). The QDRO states that Linda will receive her portion of the pension when Billy reaches the earliest retirement age under the plan. See also 26 U.S.C.A. 414(p)(4)(A)(B). Under the present order, and after the approval of the QDRO by the pension plan administrator, the value of Linda's portion, as of October 24, 1991, is determined and separated in an accounting procedure. But all future increases by the employer to the plan will inure to Billy's benefit.
Billy also owned approximately 85 shares of stock in Bell South Corporation valued at $34,120.90. This stock would be available to Billy only at the time he left his employment with Bell South either via retirement or termination. The chancellor awarded Linda ownership of one-half of Billy's Bell South stock.[6] Of course, Linda will receive the stock no sooner than it would become available to Billy, pursuant to the Retirement Equity Act (REA). 26 U.S.C.A. 414(p)(4)(A)(B). Again, any increases to this plan after October 24, 1991, will inure to Billy's benefit.
Finally, Billy participated in a Bell South Savings and Security Plan which in 1989 contained $32,843.00. Billy admitted during his testimony that he had withdrawn $15,000.00 from the savings plan in September of 1990 and another $15,000.00 in the first part of 1991, and had spent all of it. The paramour testified that Billy told her that Billy had placed this money where it could not be found. The chancellor found her testimony to be trustworthy. As of August 31, 1991, there was a balance of only $677.89 remaining in Billy's Bell South Savings and Security Plan. As part of an equitable division of marital assets, the chancellor awarded Linda one-half of the residue of the Savings and Security Plan, which division would amount to $338.96. Any and all increases to this plan after October 24, 1991, will belong solely to Billy and Linda will receive her part of the funds no sooner than Billy would be entitled to the same funds. 26 U.S.C.A. 414(p)(4)(A)(B).
Billy claims that the chancellor erred in awarding Linda one-half interest in his Bell South vested pension plan, one-half interest in his Bell South employee stock ownership plan, and one-half interest in his Bell South *934 Corporation Savings and Security Plan. Billy contends that he owned all the interest in the pension plan, stock, and savings, and that it was his separate property. On appeal, Billy claims Linda in no way contributed to the acquisition of this property, and nothing was ever issued in her name.
This Court is remanding for the chancellor to re-evaluate this award in light of the foregoing guidelines. However, the record clearly indicates that Billy, by and through his trial attorney, stated to the chancellor that "what we would like for the Court to do ... is determine what Mr. Ferguson's  the joint assets truly are, divide them in half or thereabouts, and make division of the property in that manner." This Court concludes that the chancellor had the authority to order a fair division of the Bell South benefits because they were marital assets accumulated through the joint contributions and efforts of the parties during the duration of this twenty-four year marriage. A spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other spouse may claim an equitable interest in such jointly accumulated property. Draper, 627 So.2d at 305-06; Jones v. Jones, 532 So.2d 574, 580-81 (Miss. 1988).
Although contributions of domestic services are not made directly to a retirement fund, they are nonetheless valid material contributions which indirectly contribute to any number of marital assets, thereby making such assets jointly acquired. And, it must be remembered, the goal of the chancellor in a divorce case is to do equity.
When a couple has been married for twenty-four years, yet the only retirement benefits accumulated throughout the marriage are titled in the name of only one spouse, is it equitable to find only one spouse entitled to financial security upon retirement when both have benefitted from the employer funded plan along the way? When one spouse has contributed directly to the fund, by virtue of his/her labor, while the other has contributed indirectly, by virtue of domestic services and/or earned income which both parties have enjoyed rather than invested, the spouse without retirement funds in his/her own name could instead have been working outside the home and/or investing his/her wages in preparation for his/her own retirement. When separate plans for each spouse are not in existence, it is only equitable to allow both parties to reap the benefits of the one existing retirement plan, to which both parties have materially contributed in some fashion.
Since Linda made material contributions as both a homemaker and a wage earner, she is equitably entitled to some portion of the couple's jointly acquired retirement funds. This Court therefore remands for review the award of approximately $17,000.00 in pension, stock, and security plans.[7] A remand to the chancery court is made to reconsider this award in light of this discussion.

F. Equitable Division of Marital Home Realty, Farm Equipment, Cattle Operation Mobile Home Park

Billy contends the chancellor lacked the authority to order him to convey, free of all encumbrances, his one-half interest in the jointly owned four acres on which the marital home was situated. Billy argues that Linda did not seek ownership; rather, she only sought permanent, exclusive use and possession of the residence together with all its contents.
"We have long recognized that, incident to a divorce, the Chancery Court has authority, where the equities so suggest, to order a fair division of property accumulated through the joint contributions and efforts of the parties." Brown v. Brown, 574 So.2d 688, 690 (Miss. 1990). In Draper, 627 So.2d at 305, this Court held that the chancery court has authority to effect the divesting of title to real estate to achieve an equitable distribution of marital assets. This is a matter committed to the discretion and conscience of the court, having in mind all of the equities and other relevant facts and circumstances. Bowe v. Bowe, 557 So.2d 793, 794 *935 (Miss. 1990). Moreover, the Chancery Court "has the authority to order an equitable division of jointly accumulated property and in doing so to look behind the formal state of title." Johnson v. Johnson, 550 So.2d 416, 420 (Miss. 1989).
"A spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding." Jones v. Jones, 532 So.2d 574, 580 (Miss. 1988) (citing Watts v. Watts, 466 So.2d 889 (Miss. 1985); Chrismond v. Chrismond, 211 Miss. 746, 52 So.2d 624 (1951)). See also Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990), where this court affirmed the lower court's decision ordering a husband to convey to his wife one-half interest in a home titled only in the husband's name.
This Court pointed out in Jones that recent cases had wrestled with the definition of "contribution" within the context of the acquisition of assets. Nevertheless, we said that "[i]f `contribution' toward the acquisition of assets is proven by a divorcing party, then the court has the authority to divide these `jointly' accumulated assets." Jones, 532 So.2d at 580.
In this case, the property was not titled solely in Billy's name, but titled to both Billy and Linda. Moreover, both parties requested, inter alia, an equitable division of the parties' jointly accumulated property. Although it is true that Linda requested in her complaint "the permanent exclusive use and possession" of the marital home together with its contents minus Billy's personal items, it is also noted that she sought a division of the marital assets.
This Court holds that under existing case law the chancellor was within his authority to order Billy to effect a transfer of title to Linda to the marital home and the surrounding four acres to accomplish an equitable division. Linda, we note, was divested of her undivided one-half interest in the adjoining 33 acres of jointly owned and accumulated real property, which was awarded to Billy. It is noted that Billy was also granted ownership of all farm equipment, a leasehold interest on farm property, a cattle operation, and his 100 shares of stock in a mobile home park. Nonetheless, this issue is remanded for consideration together with the other assets subject to equitable division, such division to be guided by the factors promulgated today.

G. Marital Home Debt Free

The chancellor ordered Billy to convey to Linda the marital home and four surrounding acres of land free and clear of any liens. There were two mortgages on the marital home and the 37 acres of land. One was to Home Federal Savings & Loan Association with an approximate balance of $14,000.00 and monthly payments of $522.00. The other, a second mortgage, is to Eastover Bank for Savings where the balance was approximately $4,000.00 with monthly payments of $96.05.
Billy argues that Linda did not request that the marital home be conveyed to her debt free; rather, she merely asked that he "pay" the mortgage payments. He also denies that he has the resources to pay off the two loans. Billy says it is inequitable to order him to convey the property to Linda debt free because, inter alia, he is not "a wealthy man with unlimited resources who can easily pay off a debt."
Linda requested "permanent exclusive use and possession" of the marital home. The combined mortgage notes on the marital home and its four acres plus the other 33 acres of real estate are $618.05. Linda requested periodic alimony in the amount of $2,200.00 if she were awarded the home and had to make the payments or, alternatively, $1,200.00 a month if she were required to move out of the house. She was awarded periodic alimony in the amount of $400.00 a month plus title to the marital home and four acres of land, free of liens. Billy received 33 acres of land, 2 tractors, 3 trucks, an interest in a cattle business, 10% interest in a mobile home park, and a leasehold interest in some farm property. This Court directs review of all marital divisions. However, the record did not establish with clarity the value of Billy's interest in the cattle operation or his part-interest in the mobile home park. Such value should be established especially to explain *936 the award of $30,000 lump sum alimony hereinafter discussed.

H. Periodic and Lump Sum Alimony

Billy contends that the chancellor abused his judicial discretion in awarding periodic, continuing, or permanent alimony in the sum of $400.00 a month and lump sum alimony in the amount of $30,000.00, the latter to be paid in increments of $10,000.00 on January 1st of each year, beginning January 1, 1992. According to Billy, the awards were excessive, and the chancellor failed to take into consideration the reasonable needs of the wife as well as the right of the husband to lead as normal a life as reasonably possible with a decent standard of living. Billy also complains the chancellor erred in ordering him to provide Linda with health and hospitalization insurance through his employer for "as long as the law allows."
Linda's Income and Expense Statement reflected that she earned a gross monthly income of $820.00 per month. Linda estimated a 10 to 15% reduction in pay due to the required taxes. Her only other assets were a 1988 Oldsmobile, her undivided one-half interest in the marital home, its contents, and thirty seven (37) acres of real property acquired during the marriage and jointly held. The latter consisted of the marital home and four acres of land purchased in 1972 from Billy's father, ten (10) adjoining acres purchased from Billy's mother in 1974, and twenty-three (23) adjoining acres purchased in 1979, all purchased for $400.00 an acre.
Billy's Income and Expense Statement reflected that he earned a gross monthly income of $3,030.00 per month; with a net take-home pay of $2,063.00 a month after taxes. Other monthly deductions included $33.00 for union dues, $43.00 for a savings plan, $322.00 paid to the credit union for payment on a loan, and $28.00 a month for savings bonds. Health insurance for Billy and his dependents was paid by Bell South. Other than his undivided one-half interest in his real property, Billy owned two (2) tractors and three (3) pickup trucks. There was some testimony concerning his interest in the cattle business and his 10% interest in a mobile home park which Billy admitted had value.
The chancellor stated on the record that he tended to believe the testimony of the paramour that Billy had withdrawn $30,000.00 from his Bell South Savings and Security Plan and put it where nobody could get to it or find it. He awarded this amount to Linda as lump sum alimony to be paid in three installments. Just as in Tutor v. Tutor, 494 So.2d 362 (Miss. 1986), Linda worked and contributed to Billy's financial status, but had no assets of her own; her separate estate pales in comparison to Billy's. This award of lump sum alimony may have been made by the chancellor to give Linda financial security. See also Cheatham v. Cheatham, 537 So.2d 435, 437-38 (Miss. 1988). An explanation of the basis of this award will help this Court determine whether the distribution represents an abuse of discretion or a division supported by the record. Therefore, a remand is warranted on this issue.
Our review of the record shows an insufficient valuation of the cattle operation and the 100 shares of stock in the mobile home park and leasehold interest in the farm property. The value of the thirty-three (33) acres of real estate with a value of at least $400.00 an acre was awarded to Billy together with his leasehold interest in farm property, his interest as a partner in the cattle operation, and his 10% interest in the Chunky Square Mobile Home Park is unknown, and therefore, review by this Court is not available. A reevaluation by the chancellor on remand is warranted.
Finally, the chancellor was not manifestly wrong in ordering Billy to maintain insurance on Linda under the Bell South COBRA plan for as long as the law allowed. Linda is eligible for COBRA coverage for thirty-six (36) months from the time of her divorce from Billy. 29 U.S.C.S. 1162(2)(A)(iv) (1993) and 29 U.S.C.S. 1163(3) (1993).

I. Attorney Fees

The chancellor awarded Linda attorney fees in the amount of $5,000.00. Billy claims the award of this fee, under the circumstances, *937 was an abuse of the chancellor's discretion because there was no proof as to the financial ability of Billy to pay an attorney fees. Linda had no savings from which she could pay a fee.
The question of attorney fees in a divorce action is a matter largely entrusted to the sound discretion of the trial court. Smith v. Smith, 614 So.2d 394, 398 (Miss. 1993); Kergosien v. Kergosien, 471 So.2d 1206, 1207 (Miss. 1985). "If a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." Martin v. Martin, 566 So.2d 704, 707 (Miss. 1990). See also Jones v. Starr, 586 So.2d 788, 792 (Miss. 1991) ("Generally, it is true that, unless the party can establish inability to pay, attorney's fees should not be awarded by the court."). The criteria to be utilized in determining attorney fees are found in McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982).
Linda's lawyer testified, among other things, that he had been engaged in the general practice of law since 1973 and had been paid $1,000.00 to date by his client. Cobb asked the court for $9,100.00 in fees to include the prosecution of the case during the two day trial. Linda had no cash funds from which the fee could be paid.
We are "reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award." Geiger v. Geiger, 530 So.2d 185, 187 (Miss. 1988). Considering the record as a whole, with respect to the work performed by Cobb and the financial position of the parties (including the testimony of Billy's hiding assets), this Court cannot say that an award of $5000.00 for services performed both prior to and during the two day trial was unreasonable or an abuse of the chancellor's judicial discretion. The attorney fee for these past services is affirmed.

J. The Property Lien

In her complaint for divorce, Linda requested that the court "impress a lien against the husband's interest in the real property/personal property to insure the proper payments as set forth herein." As this case is being remanded for a proper determination of property division pursuant to the guidelines set forth today, the lien imposed by the chancellor is also remanded.

K. Manifest Error

Billy's final proposition is simply a restatement and summary of all the previous errors alleged.

V. CONCLUSION
In light of the pronouncement of these guidelines for the equitable distribution method of division of marital assets, this Court reverses the issues relating to marital property division and remands for determination of value of all assets and further consideration of division in light of the principles established herein. The granting of a divorce to Linda, together with child custody and support awards, and the award of attorney fees are affirmed. The child support award may be re-considered in conjunction with alimony and property division.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
HAWKINS, C.J., concurs in part and dissents in part with separate written opinion.
DAN M. LEE, P.J., concurs in part, dissents in part with separate written opinion joined by McRAE, J.
McRAE, J., concurs in part, dissents in part with separate written opinion joined by DAN M. LEE, P.J.
HAWKINS, Chief Justice, concurring in part and dissenting in part:
I concur with the excellent factors Presiding Justice Prather sets forth in making an award to a spouse in a divorce proceeding. This can be accomplished, however, by the tools a chancellor presently has under Jones v. Jones, 532 So.2d 574 (Miss. 1988). Rather than creating  like the Genie in Alladin's Lamp  some property right simply by being married, or "compensating" her for services, a far safer course is to use the tool we have. The right of each individual to own and enjoy *938 property in his or her own name, undisturbed and unfettered by any government, is a sacred right. Fitzhugh v. City of Jackson, 132 Miss. 585, 605, 97 So. 190, 192 (1923); Art. 4, § 94, Mississippi Constitution.
In the past decade we have greatly expanded a wife's claim upon her husband's assets through lump sum alimony; we can go even further as justice and fairness demand. We do this not to "compensate" a wife for her services, although the kind of wife she has been through the years is a proper consideration. Nor, have we attempted to divest the husband and invest in his wife legal title to his property as an incident of ownership in her simply because they were married. Much more accurately and precisely, we have done so because the wife has a rightful monetary claim against him due to the fact that her life is being forever changed by divorce. For this drastic change, this upheaval in her life, she should be compensated and adequately provided for. The views expressed here are amplified in my dissent Hemsley v. Hemsley, 639 So.2d 909 (1994).
DAN M. LEE, Presiding Justice, concurring in part and dissenting in part:
I concur with the majority to a limited degree. I agree that the chancellor's awards to Linda and Billy should be reversed and remanded for re-evaluation, and I acknowledge the propriety of affirming the grant of divorce, as well as child custody and child support to Linda.
However, I do not agree with the guidelines for dividing marital property as suggested by the majority. While correctly acknowledging that a "material contribution" is required before property titled in the name of the other spouse is considered "marital property," and that no "per se" material contribution arises by virtue of the mere existence of a marriage, the proposed guidelines relegate the imperative of a spouse's "material contribution" to a mere consideration for a chancellor. But, on the contrary, before property titled in the name of one spouse is subject to further consideration for division by any method, it must first be determined that such property is properly characterized as "marital property."
Additionally, because it represents an improper exercise of power, I especially cannot join the assertions of the majority which seek to impose the division of marital property. Such action constitutes judicial legislation which violates the doctrine of separation of powers prohibited by the Mississippi Constitution, as well as implicating the right to contract and Due Process protection afforded by the Constitution of the United States.

I.

INEQUITY OF THE CHANCELLOR'S ORDER
The order appealed from the lower court is patently unfair, exhibiting disregard for the meaning of "equity." In addition to awarding Linda a 1988 Oldsmobile, periodic alimony of $400.00/month, child support of $300.00/month, and allowing her to keep her existing one-half interest in the marital home "debt-free," the chancellor's divorce decree effectively awarded Linda relief of lump sum alimony and assets totaling $70,800.00, "plus" the market value of Billy's one-half interest in the marital home, while simultaneously leaving Billy with only $319.00 out of his $1537.00 "net" monthly take-home pay.
Effectuating his awards to Linda, the chancellor ordered Billy to do the following:
(1) convey his one-half interest in the marital home, its contents, and the surrounding four acres of land to Linda free of the current debt of $18,000.00 encumbering the entire home (monthly note payments of $618.05);[1]
(2) transfer to Linda, one-half of his Employee Stock Ownership Plan (ESOP) which has a current value of $34,120.90;

*939 (3) pay Linda $30,000.00 lump sum alimony, payable in three annual installments of $10,000.00 each;
(4) pay Linda's attorney fees of $5,000.00;
(5) dispossess himself of one-half of his $800.45 company pension plan in favor of Linda; and
(6) pay Linda one-half of the $677.89 remaining in his company savings plan.
Billy was also ordered, on a continuing basis, to:
(7) pay periodic (monthly) alimony of $400.00 to Linda;
(8) maintain health and hospitalization insurance on Linda; and
(9) pay child support of $300.00 per month.
Billy has limited resources from which he can comply with the chancellor's order. Other than one-half of his ESOP ($17,060.00, available only upon retirement or termination from employment), the one-half interest in his pension plan ($400.20), and the one-half interest in the remaining balance of the Savings and Security Plan ($338.96), the chancellor allowed Billy to keep two tractors, three pick-up trucks, his interest in a cattle business which has not produced any profits for him to date, and his ten percent (10.00%) interest in a mobile home park which has some unknown value. Additionally, Billy was awarded full interest (Billy's and Linda's interest) in thirty-three (33) acres of land adjoining the marital home, which was previously purchased from Billy's parents for $400.00 per acre (13,200.00).
After taxes and other deductions, Billy has monthly net take-home pay of $1,637.00 from his job. From that amount, the chancellor's order requires Billy to pay $400.00 alimony to Linda, $300.00 child support, and as mentioned earlier, $618.05 in mortgage or other bank payments if he cannot retire the existing first and second mortgages on the marital home. That scenario leaves Billy with $319.00 per month on which to pay for a place to live, food, transportation, and clothing.
Meanwhile, Linda acquires 100% ownership of a "debt-free" home in which to live, while simultaneously receiving monthly alimony of $400.00 and monthly child support of $300.00, supplementing her employment income of approximately $820.00 per month. Additionally, she will receive the aforementioned annual lump sum cash payments of $10,000.00 (an additional $833.33 per month). The net monthly result of the chancellor's order leaves $319.00 for Billy and $2,353.00 for Linda, on which to maintain a standard of living.
Such a lopsided result is inequitable, regardless of which spouse was at fault. As stated in Nichols v. Nichols, 254 So.2d 726 (Miss. 1971):
Any test of the justice of such award must include not only the benefit to the wife but the resultant burden to the husband. Once it is determined ... that the amount awarded is of sufficient benefit to the wife, there remains the duty of testing the extent of the correlative burden upon the husband.

Nichols, 254 So.2d at 727 (emphasis added) (citations omitted).
The award of alimony to the payee spouse is to be balanced with the ability of the payor spouse to make payments. In another case, this Court stated that, "[t]he chancellor should consider the reasonable needs of the wife and the right of the husband to lead as normal a life as possible with a decent standard of living." Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990) (citing Massey v. Massey, 475 So.2d 802, 803 (Miss. 1985)).
The total alimony awarded Linda by the chancellor was beyond Billy's ability to pay, exhibiting disregard of the standard which a chancellor is obligated to follow  an abuse of discretion yielding an inequitable result.

II.

EQUITABLE DISTRIBUTION
By the decision today, the majority suggests that Mississippi should judicially adopt the doctrine of equitable distribution. However, forty-nine (49) states, plus the District of Columbia, have enacted statutes which legislatively direct that "marital property" be divided in accordance with either equitable distribution or community property guidelines upon the dissolution of a marriage.[2] *940 Yet, the majority proposes that the citizens of Mississippi: (1) yield to the replacement of their opinions and sentiments by the views of a majority of this Court: (2) forego the right to have an equitable distribution statute enacted by their elected legislature before implementation of a new system of property ownership and redistribution of wealth.

A. JUDICIAL LEGISLATION
The majority's opinion represents usurpation of legislative power because, instead of interpreting the law, it states what the law shall be  a legislative function. Thus, the majority's actions represent a violation of the doctrine of separation of powers which is prohibited by the Mississippi Constitution.[3] As this Court stated in a prior case:
In In re Shear, 139 F. Supp. 217 (N.D.Cal. 1956), the Court, in discussing separation of powers among the three branches of government, stated:
It is one of the fundamental principles of our government that the legislative power shall be separated from the judicial power. The power to declare what the law shall be belongs to the legislative branch of the government.... The legislative department alone has the duty of making laws.

Presley v. Mississippi State Hwy. Com'n, 608 So.2d 1288, 1294-95 (Miss. 1992) (emphasis added).
The majority contends that adoption of the equitable distribution system is authorized by Miss. Code Ann. § 93-5-23 (Supp. 1993). Apparently, the majority interprets that statute as a grant of authority which allows the judiciary to sanction utilization of a system of property division which contravenes and interrupts our existing statutory framework in many areas of the law. Statutes which control or affect property ownership, contractual rights, notice requirements, trusts, wills, partnerships, taxation, and future interests, to name a few, would be abrogated or afflicted to one degree or another. I question whether Miss. Code Ann. § 93-5-23 (Supp. 1993), is properly interpreted by the majority.

B. "MARITAL PROPERTY" IS NOT DEFINED
A fundamental flaw with the majority's opinion is the conspicuous failure to require a finding that the property sought to be divided should be characterized as "marital property."[4] The majority espouses eight (8) factors to be considered by a chancellor when equitably dividing marital property. Yet, the prerequisite of determining whether the property at issue constitutes marital property, and should therefore be considered for division, is overlooked and subsumed by one of those factors.
Our prior cases requiring a finding of a "material contribution" towards the acquisition of the property at issue by the non-titled spouse before the property was deemed marital property subject to equitable distribution. Brendel v. Brendel, 566 So.2d 1269 (Miss. 1990); Jones v. Jones, 532 So.2d 574 (Miss. 1988); Dillon v. Dillon, 498 So.2d 328 (Miss. 1986); Watts v. Watts, 466 So.2d 889 (1985); Clark v. Clark, 293 So.2d 447 (Miss. 1974). See also Bowe v. Bowe, 557 So.2d 793 (Miss. 1990).
However, the majority haphazardly relegates that prior threshold requirement of finding a "material contribution" to a mere "consideration" for the chancellor, leaving the property which might properly be subject to division unidentified and undefined. Consequently, a chancellor may fail to divide property which is "marital property" by our *941 prior interpretations of that term. Alternatively, a chancellor may impermissibly divide the "separate property" of one of the spouses, breaching rights of the owner of that property.
Further, the majority's opinion addresses only one-half (1/2) of the considerations of divorcing spouses. While going to great lengths to advocate the distribution of marital assets among the spouses, the majority fails to confront the other unavoidable consideration  how should the "marital liabilities" be shared, including debt encumbering marital assets? Under the majority's proposed guidelines, how should the chancellor divide the liabilities of a couple if their liabilities exceed their assets? In that situation, would the majority also contend that the spouses should share the liabilities as freely as the majority would distribute the assets? Obviously, too many likely contingencies have not been addressed by the majority's guidelines.

C. RAMIFICATIONS
The majority's proposal would change our existing law, creating a judicial mosaic from patchwork rules and guidelines borrowed from other jurisdictions. However, that process disregards the fact that our statutory scheme, like that of other jurisdictions, is an "integrated system" of laws. We cannot borrow a statute from another jurisdiction and judicially insert it into our system without disrupting the existing statutory framework. Such action will cause our system of laws governing our citizenry to function ineffectively and will mandate amendment of affected existing statutes or enactment of additional statutes in order to remedy the calamity.
Consequently, interjection of the majority's proposed "guidelines" into our existing system would invite trouble. Their utilization would undoubtedly lead to inconsistent, arbitrary, and often egregious results.
Under the majority's guidelines, the respective "needs" of the parties is an integral component of the chancellor's consideration. Therefore, application of the majority's doctrine would lead to the inescapable situation in which a spouse, man or wife, who came to a marriage with nothing and who did little to contribute to acquiring assets but had a substantial "need" upon divorce, would leave with the "lion's share" of the marital property. Meanwhile, the other spouse, who was all but totally responsible for the acquisition of the majority of the property acquired during the marriage, would only be awarded a small portion of those assets. Such a result would not embody equity. Instead, it would merely reflect a post-marital gift.
The ramifications of today's majority opinion, if implemented, are staggering. The chain of ownership anticipated by deeds which conveyed future interests and life tenancies would be doubtful. Our "notice" statutes would be useless. Co-tenants could have new co-tenants imposed upon them. The rights of third parties in the property of a spouse would be affected, and the right to contract would be severely curtailed.

III.

CONCLUSION
If, and when, adoption of a system of equitable distribution of marital property becomes the "will of the legislature", that body will undoubtedly consider the impact of such a law on the existing statutory framework and enact or amend other statutes which will ensure an efficient and nonconflicting statutory scheme. But, today, the majority proposes a doctrine to be forced upon the citizens of this State which has far-reaching effects. Unlike many of our past decisions which affected only a small segment of the population, this opinion would have a monumental impact upon all persons in this State, wealthy and poor. Today's majority attempts to grant the spouses of Mississippi a right in all of the property of the other spouse. The only unknown factor would be the extent of that property interest. That determination would be left for a chancellor to decide in the event of, and at the time of, dissolution of the spouse's marriage.
If the majority's guidelines were adopted, a testator or a donor might no longer be free to determine who would be the "exclusive" beneficiary of their will or trust. Additionally, the majority's proposal would affect the ownership of the doctors' medical practice, *942 the attorneys' law practice, the accountants' accounting practice, as well as the ownership of all existing or future property owned by the average hard-working citizens of Mississippi.
Even the pre-nuptial agreements of spouses might be disregarded by a chancellor, according to the majority. As such, the opinion of the majority is against public policy. The State of Mississippi has always encouraged matrimony over unmarried cohabitation. However, the majority's opinion discourages the marital relationship. Persons contemplating marriage in Mississippi, as well as those currently married, will surely consider the alternative of unmarried cohabitation. That alternative would avoid the interference with their lives and their property which could be caused by today's judicial legislation.
It also appears that the power which the majority would grant to the chancellors of this State would go virtually unchecked. The majority states that a chancellor's decision involving equitable distribution which may be appealed to this Court should be reviewed under the "manifest error" standard of review. However, the proper standard of review for such appeals should be "de novo." The manifest error standard would deny meaningful review of a chancellor's application of a doctrine which would yield arbitrary results to the litigants.
Today's decision creates more problems than it solves. Consequently, I am confident that, once the smoke clears, we will reflect on today's decision with doubt and suspicion. We will surely question the prudence of hastening to a decision which caused such chaos in the daily conduct of the lives of our populace.
McRAE, J., joins this opinion.
McRAE, Justice, concurring in part/dissenting in part:
To the very limited extent that the majority affirms the grant of divorce and child custody, I concur. However, matters of child support, periodic alimony and lump-sum alimony or property division all should be remanded and reconsidered together, so that each award is considered in light of the others as well as with regard for the parties' total financial picture. The need for periodic alimony and child support, as well as the paying spouse's ability to make such payments cannot equitably be determined until after any division of marital property is made. Moreover, I share Presiding Justice Lee's dissenting view that the majority's cavalier attempt at judicial legislation does an injustice to the people of Mississippi. Not only does this short-sighted and hastily-devised scheme of equitable distribution usurp the power of the legislature and violate the separation of powers provision of the Mississippi Constitution, it impinges upon the freedom to contract. With today's opinion, the guilty spouse who pulls the trigger to initiate the divorce proceedings may be rewarded under the guise of equitable distribution. We must not forget that "[d]ivorce is a creature of statute; it is not a gift to be bestowed by the chancellor ..." Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994). Accordingly, I write to voice my concerns about the many ramifications of today's decision.
The task of ushering in a new system of dividing marital assets properly should belong in the able hands of the legislature and not with this Court. As with other matters touching on the subject of marriage and divorce, issues of marital property are part of our established statutory system. The legislature has abolished the disability of coverture, providing that a married woman shall not be limited "as to the ownership, acquisition, or disposition of property of any sort, or as to her capacity to make contracts and do all acts in reference to property...." Miss. Code Ann. § 93-3-1 (1972). The legislature has made provision for husbands and wives to sue one another. Miss. Code Ann. § 93-3-3 (1972). Similarly, the division of assets acquired during the course of a marriage is a matter for the legislature, whose task it is to make the law.
Notwithstanding the separation of powers issues raised by Presiding Justice Lee, we should bear in mind that forty-nine other states and the District of Columbia have statutes in place, most of which define marital *943 property and integrate notions of equitable distribution and/or community property into the larger legislative framework.[1] The majority regrettably incorporates by reference the broad definition of marital assets set forth in Hemsley v. Hemsley, 639 So.2d 909 (Miss. 1994). That is, marital property includes "any and all property acquired or accumulated during the marriage." Hemsley, 639 So.2d at 915. However, the Hemsley definition includes the presumption that the divorcing parties have contributed equally to the assets accumulated to a marriage. Id. That presumption contradicts the requirement recognized herein by the majority that some evidence of a contribution to the accumulation of marital assets must be made before the chancellor has the authority to make a division of property. 639 So.2d at 935. Furthermore, it contravenes the detailed contribution analysis contained within the first of the majority's eight guidelines to consider when effecting an equitable distribution of marital property; that is, whether there was a "[s]ubstantial contribution to the accumulation of the property." 639 So.2d at 913 (emphasis added).
As explained in my dissent to Hemsley, a definition of marital property which considers the ramifications of equitable distribution by setting forth express exceptions provides the touchstone of other jurisdictions' statutory schemes for the division of a couple's assets  and liabilities. For the reasons expressed therein, I further disagree with the majority's acceptance of the Hemsley definition. Moreover, today's opinion further fails to enlighten us as to how or when in the process of dividing assets matters of alimony and child support are to be considered. We are presented only with a list of eight factors to be considered by the chancellor when making a division between the parties of "any and all property accumulated or acquired during the course of the marriage." Like the guidelines provided to the lower courts for annexation cases and similar domestic situations, these will no doubt prove meaningless or lead to uneven results. For example, the chancellor is directed to take into consideration:
The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution such as, property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse.
Does property acquired before marriage or inherited during the course of the marriage, particularly if titled in the name of only one spouse, remain separate property, not subject to distribution, or does it become marital property? More to the point, regardless of title, might the character of an asset and its susceptibility to distribution be predicated upon "equitable factors" determined by the chancellor? Is the character of the property owned by one spouse or the other to be viewed in "the eyes" of the "beholding" chancellor? Might one spouse's separate property be another's marital property?
The majority opinion is littered with numerous potential impediments to the right to contract. Article 3, section 16 of the Mississippi Constitution of 1890 provides that "[e]x post facto laws, or laws impairing the obligation of contracts, shall not be passed." Article I, section 10 of the United States Constitution, likewise, prohibits states from enacting laws which impinge upon the right to contract.[2] The factors enumerated by the *944 majority, to the contrary, invite interference with the parties' rights and obligations in contracts involving third parties, as well as with each other. Because the majority accepts the definition of marital property as "any and all property accumulated or acquired during the course of the marriage," and finds that the existence of a contract is merely a factor to consider in the distribution of assets, the ramifications are far-reaching.
By judicial fiat, parties to a lease contract, an insurance contract or a business or professional partnership agreement suddenly may find themselves divested of a party or joined by a new party not contemplated when the agreement was made  a present or former spouse! Likewise, lenders or creditors, believing themselves secured by a mortgage agreement or a UCC filing, suddenly may find their interests unsecured or partially subrogated to those of a former spouse.
The majority fails to recognize the realities of contemporary marriage: many couples marry later in life, bringing with them accumulated resources, affiliations, and liabilities; many persons, because of death or divorce, enter into more than one marriage over the years; generally both spouses work, acquiring separate business, investment and retirement assets. Modern marriages involve a network of contracts governing every facet of everyday life. Under the scheme of "equitable distribution" envisaged by the majority, a party to a divorce may benefit by breaching any of these many contracts. Thus the majority opinion reflects those opinions written before the United States Supreme Court's decision in Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), which struck down an Alabama law providing that men, but not women, could be required to pay alimony. We must not forget, however, that the very objective of equitable distribution is grounded in principles of contract law: the avoidance or alleviation of unjust enrichment. The plan of "equitable distribution" announced today begs the question of whose interests are being protected. Accordingly, I share some of the many concerns which come to mind.

A. Prenuptial Agreements
As between spouses, certain contracts or agreements often dictate whether assets acquired prior to or during the marriage are considered marital or separate property. The author of the majority opinion previously has written that "[a] property settlement is a contractual agreement governed by the law of contracts" and recognized "the freedom to contract and the right of sui juris married adults to enter into a valid and binding agreement regarding their property." Grier v. Grier, 616 So.2d 337 (Miss. 1993) (Prather, J., dissenting). Indeed, this Court long has recognized that prenuptial agreements are like any other contract, and when fairly made, are favored by the courts. Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss. 1988); Stevenson v. Renardet, 83 Miss. 392, 35 So. 576 (1904); Gorin v. Gorin, 38 Miss. 205 (1859). Yet, the existence of a prenuptial agreement or other written property agreement is not even recognized as a factor to consider in dividing marital assets. Further, the majority provides no safeguards for the validity of such contract. Thus, property brought to the marriage by one spouse with the intent, by prenuptial agreement, to remain separate property or to be divided in a particular manner upon divorce, may be deemed marital property, regardless of contrary contractual terms, where the chancellor finds that "equitable factors" so dictate. In contrast, the Wisconsin statute, for example, provides a statutory safeguard by considering:
Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

*945 Wis. Stat. Ann. § 767.255(11) (quoted in LaRue v. LaRue, 172 W. Va. 158, 304 S.Ed.2d 312, 316 n. 3 (1983) (emphasis added).
Such statutory provisions go a long way to help safeguard the freedom to contract, without which, the parties themselves may see the evisceration of prenuptial contracts entered into in good faith, as well as of those assets the agreements were intended to protect.

B. Inherited Property and Inter Vivos Gifts
Whether acquired prior to the marriage or during the marriage, statutes in most jurisdictions provide that trusts, inherited property and inter vivos gifts are separate property and not subject to equitable distribution. Because the majority adopts a definition of marital assets which encompasses "any and all property acquired or accumulated during the course of the marriage," we are left with a system which subjects inherited assets to distribution when equitable considerations so dictate. Under the majority opinion, a widow, upon remarriage to a less fortunate gentleman, could jeopardize her share in her first husband's estate. A parent who purchases a house for his college-age child as joint tenants might find himself in co-tenancy with the child's spouse, and, later, ex-spouse. An individual devising a will or establishing a trust fund must carefully structure his granting language so that his intent is not thwarted should the beneficiary later marry and then divorce. As one court aptly pointed out:
Finally, we are mindful that the inclusion of inherited property in the marital estate subjects it to being removed from the natural line of succession, thus thwarting the desire of the persons who acquired it and passed it on to the spouse in possession. At the same time, the spouse who made no contribution toward acquisition of the property benefits from the windfall award.
Hussey v. Hussey, 280 S.C. 418, 423, 312 S.E.2d 267, 279 (Ct.App. 1984). In those instances where gifts, trusts and estates may be considered by the courts in the process of dividing marital property, legislatures and courts in other jurisdictions have looked not at the perceived relative "needs" of the parties, but at factors such as the origin of the property; whether it has been used for the common benefit of the parties; whether it has been commingled with other assets; the characterization of income from and appreciation of the asset in question, and the beneficiary's right to invade corpus. See Michael Diehl, Note, The Trust in Marital Law: Divisibility of a Beneficiary Spouse's Interest on Divorce, 64 Tex.L.Rev. 1301, 1338-1354 (1986).

C. Business Interests and Partnerships
Some jurisdictions consider partnerships, joint ventures, shares of stock in a closely-held corporation, or other business relationships with contractual underpinnings to be marital assets subject to equitable distribution. Because the majority adopts a definition of marital property which includes "any and all assets accumulated or acquired during the course of the marriage," we can only assume that where it might be perceived that equitable circumstances so dictate, these interests might be deemed marital property. However, when dividing these assets, other jurisdictions have considered the ramifications of equitable distribution in harmony with other statutory provisions. For example, when valuing the assets of a partnership and determining the former wife's equitable interest therein, the Arkansas court turned to the Uniform Partnership Act, adopted in that jurisdiction as it has been in Mississippi, to render its decision. Riegler v. Riegler, 243 Ark. 113, 419 S.W.2d 311 (1967). See also Dag E. Ytreburg, Annotation, Evaluation of Interest in Law Firm or Medical Partnership for Purposes of Division of Property in Divorce Proceedings, 74 A.L.R.3d 621 (1976 and Supp. 1993). How are the assets of the business to be determined? Is goodwill taken into consideration? If funds are not available to "buy out" the spouse awarded an interest in a partnership, close corporation or other business, can the "new" partner or shareholder claim a voting stake in the enterprise? Conversely, when, for example, a judgment against a partnership exceeds its assets and insurance, must the spousal partner share the liability? In a family-owned close corporation, where the business is owned and operated by one *946 spouse and the adult children, can the other spouse be awarded a substantial share of the business to the detriment of the children? Who shoulders the tax burden of any transfer of interests or liquidation of business assets to effect a distribution to a former spouse, the business or one of the divorcing parties? Without consideration of statutes governing other areas of the law, the division of business interests can greatly interfere with existing contracts and agreements.

D. Creditors, Lienholders and Mortgage Lenders
In dividing marital assets, the majority directs the chancellor to "consider" the "contractual or legal consequences" to third parties. Apparently, assets subject to a lien, mortgage or otherwise encumbered, with or without an express contractual agreement, are not precluded from distribution as a marital asset. Thus, without notice or regard for any statutes which may control, a secured transaction between two parties may, by judicial fiat, be rendered an unsecured transaction amongst three parties. If, for example, one spouse is awarded the family vehicle, security for an automobile loan procured and signed only by the other spouse, to whom may the bank turn for repayment of the loan? Does the bank still have a priority interest in the vehicle? Can the court assign consumer goods, subject to a perfected security interest by the creditor, to a spouse who is not a party to the security agreement? The majority has failed to take into consideration the myriad statutes which govern secured transactions, mortgages and other loans, and real property transfers. In essence, the majority sanctions the transfer of property, both real and personal, without regard for title or contracts, or even the statutory formalities of written documents, signatures and notices. Today's majority opinion provides no protection for lenders, creditors, lienholders or other third parties who hold contractually enforceable security interests which might be adversely affected by the "equitable" distribution of marital assets.
It appears that under the principles of equitable distribution, one spouse may be liable for the debts of the other incurred during or even before marriage, regardless of that spouse's involvement in incurring the debt. The majority neglects also to consider the effects of its decision on couples not contemplating divorce. By designating virtually all property as marital property, the assets of both spouses, the so-called marital property, might be used to cover one spouse's debts, even if the debt was incurred despite the other's objection. Thus, one spouse's assets may be subjected to the other's debt. To some extent, this surely would conflict with Miss. Code Ann. § 89-1-29 (1972), which limits the power of just one spouse to encumber or convey a homestead. Are we adopting the presumption of shared liability that has been accepted by community property states? See Keith D. Ross, Note, Sharing Debts: Creditors and Debtors Under the Uniform Marital Property Act, 69 Minn.L.Rev. 111 (1984). If so, the ramifications are far-reaching, touching upon the property and contractual rights of every married couple living in the state.

D. Valuation of Assets
The majority recognizes that before any division of property can be made, some valuation of the property must be made. However, it states that "property division should be based upon a determination of the fair market value of the assets...." Slip Op. at 11. By so finding, it fails to take into consideration any indebtedness upon those assets or the tax consequences of dividing or liquidating them. Instead, valuation should be based on "net assets;" that is, "the indebtedness owed against such asset should ordinarily be deducted from its fair market value." LaRue v. LaRue, 172 W. Va. 158, 304 S.E.2d 312, 320 (1983). At the very least, the couple's liabilities should be factored into the valuation process to protect creditors and insure that one party is not left with all of the debts while the other enjoys the benefits of newly-unencumbered assets. See e.g., Fla. Stat. Ann. § 61.075 (amended 1991) (provides for equitable distribution of marital assets and marital liabilities); N.M.Stat. § 40-3-9 (1978 and Supp. 1993) (provides definitions of separate and community debt); Va. Code Ann. § 20-107.3(C) (amended 1991) (empowers court to apportion and order payment of *947 debts of the parties incurred prior to dissolution of the marriage). Finally, when determining the couple's net assets, we must place a price tag also on the value of an award of the use of any real or personal property, on either a temporary or permanent basis.
The majority further neglects to suggest how valuation should be accomplished. Should the chancellor hear only evidence based on the parties' opinions or is expert testimony required to establish the value of such diverse assets as those held by the Fergusons: stock, cattle, farm land and equipment, a partnership in a cattle operation and an interest in a mobile home park? The more complex a family's financial situation, the more necessary expert testimony is to fairly and accurately ascertain the value of the assets in question.
Having coyly ushered in the doctrine of equitable distribution via the issuance of guidelines for chancellors, the majority has winked at the constitution, usurped the power of the legislature and devised a scheme which threatens the contract and property rights of every married couple in Mississippi. By its adoption of a definition of marital assets which encompasses "any and all property accumulated or acquired during the course of the marriage," its failure to establish methods for its valuation, its disregard for our existing statutory framework and its lack of consideration for the ramifications of its actions, the majority has created a nightmare that will haunt us for years to come.
Despite its intimations to the contrary, the majority today announces new principles of law which have far-reaching ramifications. Moreover, it remands the case for the chancellor to make a redetermination of alimony and property division, subjecting the Fergusons to new rules not in place or even anticipated by them when they initiated this cause of action. Yet, where the author of today's majority opinion perceived a majority decision as enlarging the scope of a builder's duty, she wrote that "fairness dictates ... the rule should be made prospective in application." Gilmore v. Garrett, 582 So.2d 387, 399 (Miss. 1991) (Prather, P.J., dissenting). I do not favor prospective application of the law and believe that we should follow instead the Blackstonian tradition of retroactive relief as the general rule of construction. The United States Supreme Court has now come full circle to apply new law retroactively in both civil and criminal cases. Harper v. Virginia Department of Taxation, 509 U.S. ___, ___-___, 113 S.Ct. 2510, 2519-20, 125 L.Ed.2d 74, 88-89 (1993). It is ironic, therefore, that the author and several members of the majority of today's opinion advocate prospective application of the law when life and liberty are at stake, but accept retroactivity when property rights are on the line.
Accordingly, for the reasons stated herein, I concur only with the grant of divorce and award of custody, and dissent from the remainder of the opinion.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] Windham v. Windham, 218 Miss. 547, 554, 67 So.2d 467, 472 (1953) (chancery court did not have authority to transfer title to real estate); McCraney v. McCraney, 208 Miss. 105, 107, 43 So.2d 872, 873 (1950) (same). See also Jones v. Jones, 532 So.2d 574, 582 (Miss. 1988) (Prather, J., concurring).
[2] The persistent attempts made to put a monetary value on a homemaker's contribution are likely to undervalue the magnitude of such contributions. See Hauserman, Homemakers and Divorce: Problems of the Invisible Occupations. Family L.Q. (1982). Nonetheless, estimates of replacement loss are made as high as $40,000 per year. Discussion with Sanford N. Katz, Professor of Law, Boston College Law School (March 25, 1982). [Footnote in original text].
[3] South Carolina judicially created a "special equity doctrine" by holding that "where a spouse has made `marital contributions' of industry and labor during marriage to acquisition of property, a special equity or equitable interest favoring that party can be found." Parrott v. Parrott, 278 S.C. 60, 292 S.E.2d 182 (1982). Florida preceded South Carolina with this action. Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980). West Virginia adopted equitable distribution method in LaRue v. LaRue, 172 W. Va. 158, 304 S.E.2d 312 (1983), 41 ALR 4th 445. Virginia also recognizes equitable distribution. Williams v. Williams, 4 Va. App. 19, 354 S.E.2d 64 (1987).
[4] While the issue can be simply stated, it is impossible to give a precise definition to the phrase "equitable distribution." Basically, the doctrine refers to the authority of the courts to award property legally owned by one spouse to the other spouse, and recognizes that a nonworking spouse's efforts contribute to the acquisition of the marital estate. Divorce-Equitable Distribution, 41 ALR 4th 481, 484. Under the equitable distribution system, the marriage is viewed as a partnership with both spouses contributing to the marital estate in the manner which they have chosen.
[5] Other statutes require the contribution of both parents toward support of their children. Miss. Code Ann. § 93-13-1 (1972).
[6] At trial Billy had stated he was willing to give Linda one-half of this stock.
[7] The QDRO should also specify that the ex-wife is to be treated as the participant's "surviving spouse" in order to insure that the ex-wife's rights to the various retirement funds will not terminate at participant's death. 26 U.S.C. § 414 (p)(5) (1993).
[1] It should be noted that, in order to transfer the marital home and surrounding property to Linda "debt-free", as ordered, Billy will probably be forced to refinance the existing first and second mortgages on the property because of insufficient available resources to retire the debt. This will entail an additional monthly expenses of at least $618.05 which Billy will incur, if he can procure financing.
[2] See LaRue v. LaRue, 172 W. Va. 158, 304 S.E.2d 312, 316-17, and n. 1 (1983). The text of that opinion and the cited footnote state that, at that time, thirty-nine (39) states, plus the District of Columbia, had enacted some form of equitable distribution statute, while eight (8) states had adopted community property statutes. Since publication of that opinion, the legislatures of Florida and South Carolina have enacted statutes which subject assets acquired during a marriage to equitable distribution. Fla. Stat. Ann. § 61.075 (West Supp. 1993) (enacted in 1988); S.C. Code Ann. § 20-7-471 (Law Co-op. Supp. 1993) (enacted in 1986).
[3] Miss. Const., art. 1, §§ 1-2 (1890).
[4] The phrase "marital property" is used interchangeably with the term "marital asset".
[1] See e.g. Ala. Code § 30-2-51 (1979); Alaska Stat. § 25.24.160 (1991); Ariz. Rev. Stat. Ann. §§ 25-211 and 25-213 (1973); Ark. Code Ann. § 9-12-315 (amended 1993); Colo. Rev. Stat. Ann. § 14-10-113 (1973); Del. Code Ann. 13 § 1513 (amended 1993); Fla. Stat. Ann. § 61.075 (amended 1991); Ga. Code Ann. § 19-3-9 (1981); S.H.A. 750 ILCS 5/503 (amended 1993) (former Ill. Rev. Stat. ch. 40, para. 503) (1991)); Ky. Rev. Stat. Ann. § 403.190 (1972) (rev. 1986); Me. Rev. Stat. Ann. tit. 19, § 722-A (1979); Md. Code Ann., Family Law § 8-201 (1984); Minn. Stat. § 518.54 (amended 1993); Mo. Rev. Stat. § 452.330 (1988); N.C. Gen.Stat. § 50-20 (amended 1987); N.H. Rev. Stat. Ann. § 458:16-a (1987); N.J. Rev. Stat. § 2A:34-23 (1988); N.M. Stat. Ann. § 40-3-8 (1978 and Supp. 1993); N.Y.Dom.Rel. Law § 236 (1986); Ohio Rev. Code Ann. § 3105.17.1 (Supp. 1993); R.I. Gen. Laws § 15-5-16.1 (1992); Tenn. Code Ann. § 36-4-121 (1991); Va. Code Ann. § 20-107.3 (1989); W. Va. Code § 48-2-1 (1992); Wis. Stat. Ann. § 767.255 (1986).
[2] Of course, it is well-settled that the marriage contract, itself, is not a "contract" within the meaning of art. I, § 10. McCree v. McCree, 464 A.2d 922, 930-931 (App.D.C. 1983) [quoting Maynard v. Hill, 125 U.S. 190, 211, 8 S.Ct. 723, 729-30, 31 L.Ed. 654 (1888)].