# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CT-01141-SCT

*HOWARD HUGH HENDERSON*

*v.*

*MARY K. LAWSON HENDERSON*

### ON PETITION FOR WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/12/94 |
| TRIAL JUDGE: | HON. RAY HILLMAN MONTGOMERY |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN ROBERT WHITE |
| | CHRIS N. K. GANNER |
| ATTORNEYS FOR APPELLEE: | JOANNE S. SAMSON |
| | JOHN DAVID PRICE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 11/20/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/11/97 |

**EN BANC.**

**PITTMAN, JUSTICE, FOR THE COURT:**

¶1. This matter comes before the Court after having granted Howard Henderson's petition for writ of certiorari. In an order entered October 12, 1994, the Madison County Chancery Court divided the marital property without applying equitable principles relative to the marital assets. The Court of Appeals affirmed in part and reversed and rendered in part.

¶2. We find that the chancery court failed to consider the equitable distribution of the marital assets, the award of periodic alimony, and the award of child support. Accordingly, we reverse and remand on all economic issues.

### STATEMENT OF FACTS

¶3. Mary and Howard Henderson were married on January 24, 1981, in Jackson, Mississippi. During

the first year of their marriage, they lived in a house trailer owned by Howard. At the time of the marriage, Howard was earning approximately $14,100 per year in the automotive business and Mary was earning approximately $17,900 per year as a public school teacher. At the time of the trial, Howard was earning approximately $65,000 as a parts and service director at Patty Peck Honda, and Mary was earning approximately $35,000 as a public school teacher. However, at the time of trial, one child was born to the marriage, Ryan Lawson, born on July 21, 1982.

¶4. In 1982, Mary's father, J. B. Lawson, gave the couple $20,000 to pay down on a conventional house on Springdale Road in Jackson. Mr. Lawson also loaned them approximately $12,000 to add a larger den and to remodel the kitchen. In August of 1989, Mr. Lawson died. Mary testified that prior to her father's death, she and her father talked about her selling his house on Woodstock and his house on Pepper Ridge and using the proceeds from the sale of those houses to build a house for her and Howard, which would also accommodate his wife, Mary's mother.

¶5. Between August of 1989 and July of 1992, Mary and Howard decided to build a 3,600 square foot house at 123 Carriage Lane in Madison, Mississippi. The proceeds from the sale of Mary's father's houses, the equity from the sale of the couple's home on Springdale Road, along with various Certificate of Deposits worth about $60,000, were used to build the house. At the time of completion, the house was appraised for $285,000, with an outstanding mortgage of approximately $70,000. At the time of the trial, the mortgage on the house had been reduced to approximately $68,000.

¶6. In July of 1992, Mary, Howard and Ryan, along with Mary's mother, moved into the house with Mary's mother occupying a separate apartment attached to the house. A year and three months later, October of 1993, the couple separated and Howard left the marital home to live in a house trailer nearby. Shortly thereafter, Mary filed a complaint for divorce alleging uncondoned adultery and, alternatively, irreconcilable differences.

¶7. On September 2, 1994, Mary was granted a divorce. The chancellor's order provided for the settlement of child custody, support, visitation, alimony and the division of real and personal property. The final judgment of divorce was entered on October 12, 1994. Mary was awarded custody of Ryan, and Howard was granted reasonable visitation. Mary was also awarded full use and ownership of the marital house; the Medley/Schwab account, valued at $46,000; an A. B. Culbertson account, valued at $19,212.21; her teacher's retirement account, valued at $36,000; her annuity account, valued at approximately $4,800; her credit union account, valued at $5,062.12; a checking account valued at $700; and a 1991 Dodge Caravan. She was also awarded $560 per month in child support; $683 per month in periodic alimony; and attorneys' fees and expenses totaling $4,352.92.

¶8. Howard was awarded the pontoon boat, valued between $5,000 and $6,000; a 401K plan, valued at $1,300; an A. B. Culbertson/I.R.A. account, valued at $9,000; a bicycle rack; a stereo receiver; a turntable; tapes; and a watercolor painting. Howard was also required to maintain health insurance for Ryan, and a life insurance policy in the amount of $170,000 with Ryan named as the beneficiary.

¶9. During his direct appeal, Howard argued that: (1) the lower court erred in restricting his visitation to times when his paramour was not present; (2) that the lower court erred in awarding Mary attorneys' fees in the amount of $3,500 plus expenses of $852.92; (3) the lower court failed to consider together the equitable distribution of the marital assets, the award of periodic alimony, and

the award of child support; and (4) it was error to require him to carry $170,000 of life insurance.

¶10. In its decision, the Court of Appeal affirmed the trial court as to the granting of the divorce to Mary K. Lawson Henderson. The Court of Appeals reversed and rendered on Issue I, which concerned the restriction of Howard Henderson's visitation with his son to times when his paramour was not present, and Issue II relative to the award of attorneys' fees to Mary Henderson. The court affirmed as to Issues III and IV, all being economic issues. The question presented in Issue III was "whether the court erred by failing to consider together the equitable distribution of the marital assets, the award of periodic alimony, and the award of child support?" The question presented in Issue IV was "whether the court erred in requiring Mr. Henderson to carry $170,000 in life insurance?"

¶11. In affirming Issue III, the Court of Appeals explained that the chancellor's distribution of marital assets, the award of periodic alimony, and the award of child support, based on the totality of the circumstances, were correct. After Howard's petition for rehearing was denied on December 3, 1996, he filed this petition for writ of certiorari.

¶12. We affirm the granting of the divorce, but reverse and remand all economic issues for reasons stated hereafter. We find that in determining marital assets, distribution of marital assets, and child support, the parties and the Court are entitled to more than generalities. The parties are entitled to specific findings as to property acquisition, division thereof, and contrary specific findings as to child support.

## ANALYSIS

## STANDARD OF REVIEW

¶13. In a domestic case, this Court "will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard." ***Johnson v. Johnson,*** 650 So. 2d 1281, 1285 (Miss. 1994) (citing ***McEwen v. McEwen***, 631 So. 2d 821, 823 (Miss. 1994).

## I.

¶14. First, Howard relies on ***Johnson v. Johnson***, 650 So. 2d 1281 (Miss. 1994), to argue that the chancellor erred in divesting him of all his interest in the marital home based on a finding that the marital home had been purchased with gifts received from Mary's parents. Howard explains that once those gifts were commingled with the marital property, they lost their character as nonmarital property and became subject to equitable distribution. Howard argues that Mary commingled the gifts from her parents, first by investing them in the couple's marital home on Springdale Drive, then by commingling them in accounts jointly owned by the parties, and finally by investing subsequent gifts and the equity in the Springdale Drive home into the marital home on Carriage Lane, which was titled to the parties as joint tenants and was enjoyed as the marital home.

¶15. The division of marital assets is governed by the guidelines delineated in ***Johnson, Ferguson,*** and ***Hemsley***. In ***Johnson***, the Court explained that the first step is to identify the character of the parties' assets, both marital and nonmarital, pursuant to ***Hemsley***. ***Johnson***, 650 So. 2d at 1287. The chancellor should then, in light of each party's nonmarital property, employ the ***Ferguson*** factors as

guidelines and equitably divide the property. *Id.* The Court instructs the chancellor to do no more "[i]f there are sufficient marital assets which, when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties. . . ." *Id.* However, "[i]f the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, then alimony based on the value of nonmarital assets should be considered." *Id.*

¶16. In his October 12, 1994 order, the chancellor in the instant case divided the personal property without explanation. In dividing the real property, the marital home, valued at $285,000, the chancellor stated that since the marital home was built, in large part, with money received from Mary's parents, he was awarding Mary exclusive ownership and possession. In doing so, the chancellor failed to recognize that under *Johnson*, the money received from Mary's parents, which was initially nonmarital property, became marital property when Mary commingled it with the marital assets. Moreover, as indicated by the parties' testimony, this was clearly the parties' intent at the time. More significantly, however, is the fact that Mary and Howard, married in 1981, had lived in at least three houses during the tenure of their marriage. Each house, starting with Howard's house trailer, and then the house on Springridge Road, was sold and the proceeds commingled with the couple's marital assets and used to build the marital home at issue here. The fact that Mary's parents gave her a significant portion of the down payment is certainly one of the *Ferguson* factors that the chancellor should have considered when he divided the property, but it is not the only factor to be considered..

¶17. The Court of Appeals stated that it was "satisfied that the chancellor did not err in making the equitable distribution of property based on his consideration of the totality of circumstances, including the financial declarations of both parties. . . ." We cannot be so sure because a literal reading of the chancellor's order indicates otherwise. The chancellor's decision, specifically the wording of the award of the marital home to Mary, has the effect of labeling the marital home as nonmarital property instead of an equitable distribution of marital property. This was clearly in contravention of the decisions rendered by this Court in this area. Accordingly, we reverse and remand on this issue.

## II.

¶18. We also find merit in Howard's second contention that both the property division and the periodic alimony expanded in the instant case, instead of one of them receding. In *Ferguson*, we explained that "[a]ll property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together." *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994). "If there are sufficient marital assets which, when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties, no more need be done." *Johnson*, 650 So. 2d at 1287. Alimony should be considered only "[i]f the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party." *Id.*

¶19. In the instant case, Mary was awarded $560 per month in child support and $683 per month in periodic alimony. In addition to the payment of child support and alimony, Howard was required to maintain health insurance for Ryan, and a life insurance policy in the amount of $170,000 with Ryan named as the beneficiary. Howard also complains that Mary was awarded attorneys' fees and

expenses totaling $4,352.92. However, since the Court of Appeals reversed and rendered this award, it is not discussed here other than to strike the "rendering" and remand the attorneys' fees for consideration.

¶20. Based on the chancellor's award delineated above, it is impossible to affirm the award of $683 in periodic alimony since the chancellor did not make any findings with regard to the award of periodic alimony. The chancellor failed to provide "a record of his determination of both parties' nonmarital assets and of his distribution of marital assets. *Johnson*, 650 So. 2d at 1287. When we consider the totality of the circumstances, we find no evidence of what the circumstances were.

¶21. The chancery court failed to find what was or was not marital assets and failed to consider together the equitable distribution of the marital assets, together with the award of periodic alimony. We further note that the chancellor failed to make an on-the-record determination of the economic issues presented as required by *Ferguson* and *Johnson*. While we do not disagree with the Court of Appeals' reversal of attorney fees and expenses, it seems that this issue should be again considered along with the other economic issues. Therefore, this matter is reversed and remanded on all economic issues.

¶22. **AFFIRMED AS TO GRANTING OF DIVORCE; REVERSED AND REMANDED ON ALL ECONOMIC ISSUES FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**LEE, C.J., PRATHER, P.J., BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR. SULLIVAN, P.J., NOT PARTICIPATING.**