## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-CA-01583-SCT

*DEBRA ANN PEARSON*

*v.*

*JAMES LEROY PEARSON*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 10/02/1998 |
| TRIAL JUDGE: | HON. J. N. RANDALL, JR. |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN W. CHRISTOPHER |
| | WILLIAM W. DREHER, JR. |
| ATTORNEYS FOR APPELLEE: | BREHM T. BELL |
| | ANDREW M. JONES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/01/2000 |
| MOTION FOR REHEARING FILED: | 01/20/2000 |
| MANDATE ISSUED: | 6/22/2000 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is granted. The original opinion is withdrawn, and this opinion is substituted therefor.

## STATEMENT OF THE CASE

¶2. After filing for divorce, Debra Ann Pearson and James Leroy Pearson consented to a divorce on the ground of irreconcilable differences and agreed for an adjudication by the Chancellor regarding the issues of alimony and division of marital property. The Chancellor, in making an equitable distribution of marital property, ordered Debra to convey to James her title in three parcels of real property and a 1997 Suburban vehicle. The Chancellor awarded Debra $150,000 in lump sum alimony and in settlement of any rights to marital property to which she might have a claim. Debra raises three issues on appeal, and James has cross-appealed as to one issue:

**I. Whether the Court committed manifest and reversible error in its finding that there were no marital assets and that all of the assets of the parties were the separate estate of James Pearson and thereupon ordered Debra Ann Pearson to convey unto James Pearson all of her right, title and interest in and to three parcels of real property and to transfer her title to a 1997 Suburban vehicle.**

**II. Whether the Court committed manifest and reversible error in failing to make an equitable division of marital assets.**

**III. Whether the Chancery Court's award of lump sum alimony in the sum of $150,000 was manifest error or an abuse of discretion. (Debra claims the amount is grossly inadequate, while James claims it is grossly excessive.)**

## STATEMENT OF THE FACTS[1]

¶3. Debra and James met in 1989 and lived together approximately six months before they were married on November 21, 1991. There were no children born of the marriage. In the 6 ½ years that the couple were married, they separated approximately 10 times. James claimed Debra left him each time the couple separated. Debra claimed she left James only four or five times and that she left him as the result of verbal or physical abuse. She could not recall how the other separations occurred. James admitted to having slapped Debra once in April of 1997 after she had punched him during a dispute. He claimed that Debra left him because she would get angry and irrational over trivial matters.

¶4. James was 49 years old at the time of trial and is retired from the sea-clamming business. He began clamming at age 13, working as a deck-hand for his father and others until he was 27. He then bought his first boat, using his savings as a down-payment, and went into business for himself. James was very successful in the clamming business and bought and sold several boats. In 1984, James formed a corporation with Warren Alexander known as "Alexander and Pearson," and the two of them purchased a number of large sea-going vessels to clam far offshore in the Atlantic Northeast. Shortly after the formation of the business, and prior to James and Debra's marriage, James was earning annual income of $200,000 to $250,000.

¶5. Pursuant to a new law effective in 1990, "Amendment 8 of the Magnusson Act," clam fishermen were awarded licenses known as "allocations" to clam a certain limit of bushels of clams. Allocations were based entirely on the history of a particular vessel in the clamming industry. James, who had enjoyed a long and fruitful career in the clamming business, was awarded, along with his partner, some 25% of the total allocations allowed.

¶6. From 1990 to 1993, James's income remained constant. However, in 1993, James and his partner decided to dissolve their corporation in a tax-free equal division of the assets. Pursuant to the dissolution agreement, James received allocations, a boat, and cash and other assets of around $4 million. James formed a corporation, Pearson Boys, Inc., to receive his share of the assets. From 1993 to 1997, James leased the boat and his share of the allocations back to Alexander for $125,000 quarterly, doubling his average annual income.

¶7. All of Pearson Boys' assets were acquired prior to James and Debra's marriage with the exception of approximately $354,000 worth of allocations purchased after the marriage but exclusively with Pearson

Boys funds.

¶8. In January of 1997, James sold all of the assets of Pearson Boys and officially retired from the clamming business. Pearson Boys, of which James continued as sole shareholder, received $4.8 million in proceeds. James, through his company, paid $1.3 million in taxes, paid off all existing mortgages and other debts, built two commercial shrimp boats for his sons, acquired several vehicles, and made other miscellaneous purchases, leaving a balance of $1.8 million, still held in a Pearson Boys' account.

¶9. Debra was a bartender when she met James. She quit her job after she married James and has not held any steady employment since then. She claimed that James preferred that she not work, especially during the period of time (approximately a year and a half) that one of James's sons, who is mentally retarded and now lives at a school, lived with them. Debra testified that she looked after the boy while he lived with them. James, however, testified that Debra had little patience with the boy and that James was the primary caregiver, which was why he sent the boy to live at a school for children with special needs.

¶10. Debra further testified that she took care of business affairs, such as payroll duties, keeping ledgers, and correspondence with the accountant for Pearson Boys. James, however, claimed that Pearson Boys was a mere holding company and that Debra's responsibilities amounted to nothing more than paying personal bills and helping to collect documents in preparation for filing the annual tax return. This testimony was corroborated by his attorney who testified that he (the attorney) collected all of the allocations and performed any other duties relating to the clamming business.

¶11. According to testimony, three parcels of real property were identified as having been purchased during the marriage by James and titled jointly in the names of James and Debra: (1) a house and land in Grand Bay, Alabama; (2) a duplex in Spanish Fort, Alabama; and (3) a modular home in Odessa, Florida. No documentary evidence was offered at trial to prove the ownership of the listed property, but, as the Chancellor concluded, we assume that this property was indeed titled as presented in testimony. Likewise, there was no proof offered as to the value of the property, or whether any of the real property was claimed as homestead. There were also two vehicles, a 1997 Suburban and a 1997 Expedition, titled in her name. James drove the Suburban, and Debra drove the Expedition. All of these listed assets were purchased by Pearson Boys.

¶12. Debra took large sums of money from James on three occasions when she left him. Once she took $20,000 in cash and charged an additional $16,000 to his credit card. On another occasion, she took $19,000 in cash. On their final separation, Debra took $30,000 from the Pearson Boys account and $7,000 from the joint checking account. She also kept her 1997 Expedition, valued at $32,000, and other personalty.

¶13. The Chancellor found that there were no marital assets as Debra did not contribute financially to the marriage, and all of the couple's assets were derived from James's career in the clamming business. However, looking at this Court's precedents regarding commingled assets, or the income derived from non-marital assets, the Chancellor looked to the factors of equitable distributions. *See **Ferguson v. Ferguson,*** 639 So. 2d 921, 928 (Miss. 1994). The Chancellor decided that Debra was not entitled to any of the assets except for the money and the vehicle she had taken, which James testified he wanted her to have. Therefore, the Chancellor ordered that Debra convey her title and interest to the three parcels of real property and the 1997 Suburban to James. Finding, however, that Debra should take something from the marriage for her "wifely, housekeeping, as well as what little business help, she provided during the

marriage," the Chancellor awarded her lump sum alimony in the amount of $150,000, which the Chancellor further concluded would compensate Debra for any claims she might have to her husband's separate estate, in addition to the $24,000 that James was required to pay in temporary support.

## STANDARD OF REVIEW

¶14. "Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule." *Magee v. Magee*, 661 So. 2d 1117, 1122 (Miss. 1995). An appellate court may reverse a chancellor's finding of fact only when there is not "substantial, credible evidence" justifying his finding. *Williams v. Rembert*, 654 So. 2d 26, 28 (Miss. 1995) (quoting *Snow Lake Shores Property Owners Corp. v. Smith*, 610 So. 2d 357, 360 (Miss. 1992)). "Our scope of review in domestic relations matters is limited under the familiar rule that this Court will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard." *Johnson v. Johnson*, 650 So. 2d 1281, 1285 (Miss.1994) (citing *McEwen v. McEwen*, 631 So. 2d 821, 823 (Miss. 1994)).

## DISCUSSION

**I. Whether the Court committed manifest and reversible error in its finding that there were no marital assets and that all of the assets of the parties were the separate estate of James Pearson and thereupon ordered Debra Ann Pearson to convey unto James Pearson all of her right, title and interest in and to three parcels of real property and to transfer her title to a 1997 Suburban vehicle.**

¶15. The Chancellor correctly reviewed this Court's decisions regarding marital property. In *Ferguson v. Ferguson,* 639 So. 2d 921 (Miss. 1994), and *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994), the Court set forth the law concerning division of marital property. First, the property must be classified as marital or non-marital. Marital property is "any and all property acquired or accumulated during the marriage."*Id.* at 915. "Assets acquired or accumulated during the course of the marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Id.* at 914.

¶16. Debra argues that, by titling the property jointly (or exclusively as in the case of the Suburban) in her name, James created a rebuttable presumption that he had gifted an equitable portion of the estate to Debra. In support of her argument, Debra cites *Miller v. Miller*, 298 So. 2d 704 (Miss. 1974) and *Johnson v. Johnson*, 550 So. 2d 416 (Miss. 1989). In *Miller*, this Court considered the issue of property that was jointly titled, saying "[i]n Mississippi it is settled that dissolution of a marriage by divorce does not, of itself, affect title of the respective parties to real estate owned by them." *Id.* at 706. The Court looked to the common law of property, which assumed that, under the terms of title, joint tenants each had a one-half undivided interest in the subject property. The Court concluded:

If, as contended by appellant, his cash contributions over the sixteen year period of the marriage substantially exceeded those of the appellee, the circumstances of the case [joint title] created a presumption that it was intended on his part that an equal interest in the property conveyed should go to appellee as a gift, notwithstanding a discrepancy in cash contributions. This presumption can be overcome only by clear and convincing proof to the contrary.

*Id.* In ***Johnson***, the Court also applied a gift presumption to jointly titled property, saying "we begin with the presumption that co-owners of jointly held property are equal co-contributors and owners. Where in acquiring such property one spouse has made substantially larger cash contributions, we presume that spouse has given a one-half interest to the other." 550 So. 2d at 420 (citations omitted). ***Miller*** and ***Johnson*** were pre-***Ferguson*** cases cumbered with a title theory prevalent in the common law of property. The gift presumption was nothing more than a judicial attempt to acknowledge the common law of property and title while still allowing a Chancellor to look to the actual contributions of the respective parties towards acquisition of the property. In considering distribution of what we call, post-***Ferguson***, "marital property," a Chancellor was bound by the law of property and was not able to divest title from one spouse, but could only grant an equitable lien to the spouse deserving of distribution. In the landmark ***Draper*** decision, ***Draper v. Draper,*** 627 So. 2d 302, 305 (Miss. 1993), this Court did away with those restrictions and empowered chancellors to divest title during a divorce proceeding to achieve equitable distribution. No longer then, after ***Ferguson, Hemsley*** and ***Draper***, does title create any greater property interest for the spouse in whose name it is held, or jointly held. The issue in divorce is which property is "marital property," subject to equitable distribution, and that determination proceeds absent any presumption based on title. In ***Draper***, this Court wrote the obituary of the old title theory, and with it any presumptions associated with title. ***Draper***, 627 So. 2d at 305. The Court of Appeals has recently addressed the issue of interspousal transfers of property in [*Myrick v. Myrick*](), 739 So. 2d 432, 434 (Miss. Ct. App. 1999):

> The primary thrust of ***Hemsley*** was to lessen the importance of which spouse held legal title to marital property when winding up the financial aspects of a dissolving marriage. Essentially all of the benefits arising from that case would be lost if the chancellor were, in every case, faced with a claim that the non-titled spouse agreed to vest title in the other spouse as a gift. Therefore, we hold that interspousal transfers of marital property during the marriage may not be used to support a claim that the transfer was a gift intended to deprive the property of its status as a marital asset.

¶17. We are not unmindful that this Court has applied a title or gift presumption in recent years. In [*Sarver v. Sarver*](), 687 So. 2d 749 (Miss. 1997), a husband and wife had a home that was jointly titled. The Chancellor divested the title of the wife and awarded her only a $16,000 equitable lien against the property. [*Id.*]() at 753. The wife complained on appeal that there was a rebuttable gift presumption in her favor because of the joint title, while the husband cross-appealed that the wife should have been completely divested of all interests in the home, since he had made most of the financial contribution. [*Id.*]() at 753-56. This Court affirmed the Chancellor's holding that the wife had not proven by clear and convincing evidence a gift in her favor, but did find that she should maintain the equitable lien for her help in the construction of the home and her domestic services as a homemaker. [*Id.*]() To the extent that it indicates that there is still a viable title presumption, [*Sarver*]() is overruled. We note, however, that the outcome in [*Sarver*]() was correct. The Chancellor there considered the contributions of both spouses in determining whether the subject property was marital or non-marital property and in awarding each spouse an equitable share.

¶18. In the present case, the Chancellor likewise looked to the marital character of the subject property. Specifically, the Chancellor found that the subject property may have been marital in nature because the property was commingled; however, the evidence clearly showed that all of the assets of the marriage were acquired through Pearson Boys, a holding company for James's pre-marital assets. The Chancellor did go through this Court's pronouncement of considerations for equitable distribution of marital assets. *See* ***Ferguson***, 639 So. 2d at 928. In consideration of those factors, the Chancellor found as follows: (1) Debra had not made any substantial contribution to the accumulation of assets; (2) James had successfully

paid off all of the debt of the parties and purchased large gifts for his sons and his sister; (3) Debra had taken money and appliances and furniture when she exited the marriage; (4) Debra had failed to prove the market or emotional value of any of the marital assets; (5) Debra did not contribute financially to the marriage; (6) there was no testimony by either party concerning possible tax or legal consequences of distribution; (7) the parties disagreed over how best to achieve final separation, but that such was possible through lump sum payments; (8) Debra had furniture, no outstanding indebtedness, a minimum of $61,000 of income from James in the year prior to divorce, a new vehicle that was paid for, and that she was healthy and able to work; (9) James, on the other hand, who was not healthy and had no education, could not re-enter the only job market of which he had any knowledge, clamming; (10) the marriage was not one of long duration or harmony; and (11) Debra was responsible for the instability of the relationship. *See Ferguson*, 639 So. 2d at 928.

¶19. Even considering that equity favored no division of property for Debra, the Chancellor decided that Debra should keep the 1997 Expedition and the funds she had taken from James, assets worth a total of $61,000, and be awarded $150,000 lump-sum alimony in settlement of any *and* all claims she might have to real property. That award to Debra is equitable in light of the Chancellor's stated findings and cannot be considered manifestly erroneous. The Chancellor did not err in divesting Debra of title or in awarding her a portion of the value of the property in lump-sum alimony. The Chancellor was limited in his evaluation of the property for purposes of making an equitable distribution as there was no proof offered of the value of the subject property. This issue is without merit.

### II. Whether the Court committed manifest and reversible error in failing to make an equitable division of marital assets.

¶20. Under this assignment of error, Debra argues that James's property may be subject to equitable distribution because he used Pearson Boys funds for regular household expenses, and thus commingled a marital asset with a non-marital asset. *See Tillman v. Tillman*, 716 So. 2d 1090 (Miss. 1998); *Hiegle v. Hiegle*, 654 So. 2d 895 (Miss. 1995); *Johnson v. Johnson*, 650 So. 2d 1281 (Miss. 1994). These cases are irrelevant to the one sub judice because they deal with situations in which non-marital property (one spouse's inheritance) was used to pay normal marital expenses and became commingled with the couple's joint income or other marital assets to the extent that they were inseparable. In the instant case, there was no marital asset with which James's non-marital assets were commingled. The Chancellor specifically found that there was no commingling, since all of James's assets were kept separate by virtue of the existence of his holding company, Pearson Boys, out of which all other assets were purchased.

¶21. This Court has recently addressed this issue in *A & L, Inc. v. Grantham*, 747 So. 2d 832 (Miss. 1999). In *Grantham*, this Court affirmed a Chancellor's decision that assets of a closely held corporation, owned by the husband, could be considered marital property for purposes of equitable distribution after finding that those assets had become commingled. In that case, the husband owned a corporation that he had acquired prior to his marriage, the assets of which he used to acquire a family home and to pay other normal marital expenses. In fact, in *Grantham*, the wife was a shareholder who was employed by the corporation and was paid a salary and whatever other expenses she needed for the family from corporate accounts, documenting those funds as "loans" to shareholders. *Id.* at 836-39. The Court explained that "[w]hile this does not necessarily commingle the corporations themselves or all of their assets such that the principal, as opposed to the income used becomes a marital asset, the evidence before the court in this case made it difficult to draw a precise line of demarcation." *Id.* at 839.

¶22. *Grantham* is distinguishable from the case at hand because not only did the husband there use the corporations' assets to fund normal marital expenses, his actions in regards to the corporations throughout the marriage caused an increase in value of the corporations. Specifically, the Court stated in *Grantham* that "the evidence before the Court in the instant case suggests that there was a substantial increase in the net assets of the corporations due at least in part to John's managerial effort. That increase in value, like John's other earnings, is considered a marital asset." *Id.* In the present case, however, the Chancellor found that no assets were accumulated during the marriage and that technically Pearson Boys lost assets. In addition, James kept the Pearson Boys assets separate; there is no question that the Chancellor was correct in not distributing any of the Pearson Boys assets to Debra.

¶23. Relying on *Grantham*, we are hard pressed to distinguish the marital home purchased with corporate funds in that case to the real property and vehicles at issue in this case. As to the subject property, James may have commingled the corporate assets to the extent that they may be considered marital property.

¶24. That finding alone, however, does not entitle Debra to a one-half interest in the property. Because the property is a marital asset, it is subject to equitable distribution. We have never held equitable distribution to mean an equal division. As stated above, the Chancellor in this case considered the equitable division of the subject property and made an award of lump-sum alimony to compensate Debra for her interest. There is no manifest or reversible error in this issue.

> **III. Whether the Chancery Court's award of lump sum alimony in the sum of $150,000, and no periodic alimony, was manifest error or an abuse of discretion. (Debra claims the lump sum alimony amount is grossly inadequate, while James claims it is grossly excessive.)**

¶25. "Whether to award alimony and the amount of alimony are largely within the discretion of the chancellor." *Parsons v. Parsons*, 678 So. 2d 701, 703 (Miss.1996); *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss.1995); *Cherry v. Cherry*, 593 So. 2d 13, 19 (Miss. 1991). We will not disturb the award on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error. *Parsons*, 678 So. 2d at 703.

¶26. The following factors are to be considered by the Chancellor in making findings of fact and conclusions of law and in entering judgment for alimony: (1) the income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; (7) the age of the parties; (8) the standard of living of the parties, both during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; or (12) any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support. *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993); *Hammonds v. Hammonds*, 597 So. 2d 653, 655 (Miss. 1992). *Accord*, *Gray v. Gray*, 745 So. 2d 234, 238 (Miss. 1999).

¶27. Debra is a 36 year-old woman in good health and capable of working. She testified that she would like to go to college, get a degree, and enter the work force. Debra has no children to support. She did not contribute to the financial stability of the marriage; in fact, she frequently left the marriage, taking large sums of money with her. The marriage was of relatively short duration. While Debra enjoyed a high standard of

living when she was with James, there is no reason to believe that an alimony award of $150,000 will not allow her to obtain an education and become self-supportive, her stated intention.

¶28. The Chancellor did not err in awarding a lump-sum payment instead of periodic alimony. He has great discretion in determining the amount and type of alimony, and should do so in a way to bring finality to the economic relationship of the parties, as justice and equity require. *See Ferguson*, 639 So. 2d at 927. The Chancellor's award in this case will allow a final termination of the relationship between the two parties. His award cannot be deemed an abuse of discretion or manifest error.

¶29. On cross-appeal James contends that the Chancellor's award of $150,000, in addition to the $24,000 temporary alimony, the Expedition, and the $37,000 cash that Debra took upon leaving James, is really an award of $240,000, a grossly excessive amount. However, given the disparity of the estates of the parties, this argument has no merit. Even though James is physically unable to work now and has only an eighth grade education, he still has a substantial estate with which to retire. Even an award of $240,000 to his former wife to help her get established is not grossly excessive.

### CONCLUSION

¶30. The Chancellor has great discretion in determining alimony awards and property settlement. His judgment should not be reversed absent a showing of abuse of discretion or manifest error. In this case, the Chancellor made a careful consideration of the facts and circumstances of the parties' marriage, as well as the equities involved, as documented in his lengthy and well-written Findings of Fact and Conclusions of Law. The Chancellor did not err in his determinations. Therefore, the judgment of the Hancock County Chancery Court is affirmed.

¶31. **AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL.**

**PITTMAN, P.J., SMITH, MILLS, COBB AND DIAZ, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. BANKS, P.J., CONCURS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, C.J.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART:**

¶32. I agree with the result reached by the majority because, in my view, the distribution of the assets here is equitable, taking all factors into consideration.

¶33. I write separately because I disagree that *Ferguson v. Ferguson,* 639 So. 2d 921 (Miss. 1994); *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994); and *Draper v. Draper*, 627 So. 2d 302 (Miss. 1995), somehow avoid the presumption that non-marital property, which is, subsequent to the marriage, re-titled in both parties is presumed to be a gift to the previously non-titled spouse. In other words, non-marital property, in my view, becomes marital property, absent extraordinary circumstances, where it is re-titled either partly or entirely in the name of the previously non-titled spouse.

¶34. The distinction to be made is with regard to the purpose. Property may become marital regardless of title. In order to become marital property, a spouse has only to acquire an ownership interest in the non-marital property during the marriage. *See Jones v. Jones*, 532 So. 2d 574, 580 (Miss. 1988); *Regan v. Regan*, 507 So. 2d 54, 56 (Miss. 1987), *overruled in part*, [*Tramel v. Tramel*](), 740 So. 2d 286, 290-91 (Miss. 1999). A non-owning spouse who gets an ownership interest by having such property titled in his

name during the marriage has met the ownership acquisition test as to that property. Put differently (or perhaps alternatively), when property is re-titled to the previously non-owning spouse, it is co-mingled with marital property. *See **Johnson v. Johnson***, 650 So. 2d 1281 (Miss. 1994).

¶35. I concede that in a situation similar to that which is now before the Court, this Court in ***Devore v. Devore***, 725 So. 2d 193 (Miss. 1998), seems to have concluded that titling property in the name of the non-owning spouse does not necessarily make it marital property. What that case actually stands for, in my view, is that the presumption of a gift can be overcome with evidence to the contrary. In other words, there is a two-step process. Property re-titled in the non-owning spouse's name is presumed to be a gift. If that presumption is not overcome, the property is marital property. If the presumption is overcome and it is shown that an interest in re-titled property was never actually conveyed, then the property would not have become marital property.

¶36. In ***Devore***, strong evidence suggested that placing title in the non-owning spouse's name was in the nature of a contract for which the non-owning spouse failed to render the agreed consideration. Additionally there as here, considering the property as "marital" would have been of little consequence as equity would not dictate that the previously non-owning spouse should be awarded part thereof.

¶37. In any event, I adhere to the views expressed in ***Devore*** by Chief Justice Prather in her concurring opinion, that co-titling the property ordinarily makes it marital, despite the fact that equitable distribution factors may dictate that the previously untitled spouse does not receive a share of the property.

¶38. In my view, therefore, the property co-titled in Mrs. Pearson's name became marital property subject to equitable distribution.

**PRATHER, C.J., JOINS THIS OPINION.**

1. The statement of the facts is taken almost exclusively from the thorough and well-written Findings and Facts and Conclusions of Law by Chancellor J. N. Randall, Jr.