# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01011-COA

LISA DIANN CREW                                  **APPELLANT/ CROSS-APPELLEE**

v.

**SIDNEY ELLIS TILLOTSON JR.**                    **APPELLEE/ CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/21/2017 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARTY CRAIG ROBERTSON |
| | WILLIAM CLINTON PENTECOST |
| | ROBERT MARVIN PEEBLES |
| ATTORNEYS FOR APPELLEE: | B. BLAKE TELLER |
| | JOSHUA LAWRENCE DIXON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 08/20/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., TINDELL AND McDONALD, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1. A North Carolina court granted Sidney Ellis Tillotson Jr. (Ellis) and Lisa Crew a divorce. Lisa then filed a complaint for equitable distribution in the Warren County Chancery Court. Relevant to this appeal, the chancellor determined that certain stock and other assets Ellis acquired during the marriage from Tillotson Enterprises Inc. (TEI) failed to constitute marital property. On appeal, Lisa argues the chancellor erroneously classified TEI's stock and other assets as nonmarital property, which resulted in an inequitable

distribution of the marital estate. On cross-appeal, Ellis contends the chancellor erred by not finding that Lisa's complaint for equitable distribution was barred by res judicata. Finding no error, we affirm the chancellor's judgment.

**FACTS**

¶2.     Lisa and Ellis married in December 1978. During their marriage, they had two sons and resided in Vicksburg, Mississippi. The parties separated on September 21, 2013. On December 4, 2013, Lisa filed a divorce complaint with the Warren County Chancery Court. Ellis responded and counterclaimed for separate maintenance, spousal support, and other relief.

¶3.     In January 2014, Lisa moved to North Carolina. In a complaint dated October 21, 2014, she filed for divorce in North Carolina. Lisa's North Carolina divorce complaint made no request for equitable distribution. On January 15, 2015, Lisa filed a motion with the Warren County Chancery Court to dismiss her Mississippi divorce complaint without prejudice. On February 17, 2015, the Warren County Chancery Court granted Lisa's motion and dismissed her Mississippi divorce complaint without prejudice.

¶4.     In a May 1, 2015 judgment, a North Carolina court granted the parties a divorce. Six days later, on May 7, 2015, Lisa filed a complaint with the Warren County Chancery Court for equitable distribution and other relief. Lisa asked that the chancellor give full faith and credit to the North Carolina divorce decree "and proceed to determine the financial components of the dissolution of the parties' marriage." Ellis answered and denied that Lisa was entitled to any relief. He also moved to dismiss Lisa's complaint on the basis that her

2

failure to raise equitable distribution in the North Carolina divorce proceeding barred the issue in any subsequent proceeding.

¶5.     On December 7, 2015, the chancellor entered a final judgment on Ellis's motion to dismiss. The chancellor found that Lisa's failure to request equitable distribution in the North Carolina court neither waived the issue nor barred her from raising it in the current proceeding. The chancellor determined that the North Carolina court lacked the authority to divide the parties' marital estate because the court possessed neither personal nor in rem jurisdiction over Ellis. The chancellor therefore denied Ellis's motion to dismiss. Ellis filed an unsuccessful motion to reconsider the denial of his motion to dismiss. He then unsuccessfully sought an interlocutory appeal from the Mississippi Supreme Court.

¶6.     In March and September 2016, the chancellor held a five-day trial on Lisa's complaint for equitable distribution of the marital estate. During the course of the trial, the parties signed an agreed order giving Ellis exclusive ownership of the former marital home in Vicksburg. Following the trial's conclusion, the chancellor entered a 91-page memorandum opinion and final judgment on June 21, 2017.

¶7.     The chancellor found that in 1991 Ellis and Lisa formed a partnership titled E&L Plantation through which Ellis continued his ongoing work of farming certain properties he leased from others. While Lisa never farmed on the property or operated any equipment, she did perform some bookkeeping for E&L Plantation. E&L Plantation was formed at a time when Ellis's father, Sidney Ellis Tillotson Sr. (Senior), sought to purchase some land. Senior used equipment he had accumulated as collateral for a farm loan that E&L Plantation

3

obtained. Senior later acquired about 1,200 acres of land from Sim Ramsey Jr. for $780,000. E&L Plantation paid Senior $25,000 in rent for property that the partnership rented from Senior. Ellis testified that he used the farm loan obtained by E&L Plantation to pay Senior the $25,000 in rent. Ellis's brother, Mark Tillotson, and a tenant named Roy Goode also paid $25,000 each in rent to Senior. Senior used these rent sums, plus another $25,000 that he provided himself, to make the $100,000 down payment on the 1,200 acres. Pursuant to a deed of trust executed by Senior, Ramsey financed the remaining $680,000 for Senior to purchase the land.

¶8. In May 1994, Senior formed TEI. The corporation issued 333 and 1/3 shares of stock each to Senior, Ellis, and Mark. Also in 1994, Senior signed a deed and conveyed certain property he had purchased from Ramsey to TEI. Ellis testified that around 1995 his father and brother both began to experience serious financial problems. Senior and Mark eventually surrendered their stock, which totaled 666 and 2/3 shares, back to TEI. As a result, on January 3, 1996, Ellis became TEI's sole shareholder.

¶9. Ellis testified that he farmed under E&L Plantation until Lisa filed for a divorce. According to Ellis, E&L Plantation's profits were used to pay bills for the marital household. E&L Plantation rented TEI's property. In 1995, E&L Plantation lost money, and Ellis and Lisa used $30,000 from Lisa's 401K account to keep the partnership afloat. Some of the money was also used to remodel the marital home, which the parties used as collateral for E&L Plantation in 1996. Lisa testified that she was not responsible for the debt on any businesses other than E&L Plantation.

4

¶10.   On June 3, 2004, TEI purchased real property from Ernest Thomas.  On June 12, 2007, TEI also purchased real property from James and Mary Duke.  Ellis had been renting the Dukes' property since 1986.  Ellis testified that no marital assets were used to purchase the Dukes' property.  Instead, he stated that TEI purchased the Dukes' property by obtaining a loan from River Hills Bank and that rent sums from TEI's hunting and farming leases were used to pay the bank loan.

¶11.   Lisa and Ellis stipulated to the chancellor that TEI owned three pieces of equipment valued at $20,700.  The chancellor also found that TEI owned four separate tracts of land with appraised values totaling $3,101,000.  The debt on the real property amounted to $602,095.53, and the equity in the real property amounted to $2,498,904.47.  The chancellor therefore found TEI's real property had a total value of $3,121,700, with the debt amounting to $602,095.53 and the equity amounting to $2,519,604.47.

¶12.   The chancellor found that the major source of contention between the parties was whether TEI and its accumulated assets and liabilities constituted marital assets.  Although Lisa contended TEI was a marital asset, Ellis testified that the corporation was a gift from his father that failed to constitute a marital asset.  Ellis therefore asserted that Lisa was not entitled to any equitable distribution of TEI or its assets.  The chancellor concluded that Senior did, in fact, give the TEI stock to Ellis as a gift, that Lisa did not actively participate in TEI or its business decisions, and that Lisa did not contribute to or invest in TEI's operations.  In addition, the chancellor determined that TEI's real property and equipment were purchased solely with TEI's funds and/or loans.  As a result, the chancellor also found

5

that TEI's assets never constituted marital property. Further, the chancellor concluded that TEI's nonmarital assets were never converted into or commingled with marital assets.

¶13. After classifying the parties' assets as either marital or nonmarital, the chancellor considered the *Ferguson*[1] factors and equitably divided the marital estate. The chancellor found the total value of the marital estate to be $845,237.34. The chancellor awarded Lisa assets totaling $478,497.78 (57% of the marital estate) and made her responsible for $160,444.97 of the marital debt. This amounted to an equity award of $318,052.81. The chancellor awarded Ellis assets totaling $366,739.56 (43% of the marital estate). The chancellor next analyzed the *Armstrong*[2] factors and denied Lisa's request for alimony. The chancellor also denied the parties' requests for attorney's fees and court costs. Aggrieved, Lisa appeals the chancellor's classification of TEI and its assets as nonmarital property and her distribution of the marital estate based on this classification. Ellis cross-appeals and asserts the chancellor erroneously denied both his motion to dismiss Lisa's equitable-distribution complaint and his motion to reconsider the denial.

## DISCUSSION

### I. Res Judicata

¶14. We first address Ellis's argument on cross-appeal that he voluntarily submitted to North Carolina's jurisdiction during the divorce proceeding and that North Carolina's statutory law therefore required Lisa to either raise the issue of equitable distribution or else

---

[1] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

[2] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

abandon the claim altogether. Because Lisa failed to assert the claim in the divorce action, Ellis contends she is barred from raising the issue in a subsequent proceeding. Ellis therefore argues the chancellor erred by not finding that res judicata barred Lisa's Mississippi action for equitable distribution. On the basis of this argument, Ellis asks this Court to reverse and render the chancellor's judgment. Alternatively, Ellis asks that we affirm the chancellor's determination as to equitable distribution. We review questions of law, such as issues of jurisdiction, de novo. *See Pierce v. Pierce*, 132 So. 3d 553, 560 (¶12) (Miss. 2014).

¶15.    With regard to the application of res judicata in divorce cases, this Court previously explained:

> The doctrine of res judicata reflects the refusal of the law to tolerate a multiplicity of litigation. It is a doctrine of public policy designed to avoid the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions. Res judicata bars all issues that might have been (or could have been) raised and decided in the initial suit, plus all issues that were actually decided in the first cause of action.
>
> Article IV, § 1 of the United States Constitution requires that full faith and credit be given to the judicial proceedings of sister states. However, those proceedings are only entitled to full faith and credit where the rendering court properly has subject matter and personal jurisdiction. The United States Supreme Court has applied the Full Faith and Credit Clause in the context of divorce actions.

*Lofton v. Lofton*, 924 So. 2d 596, 599 (¶¶14-15) (Miss. Ct. App. 2006) (citations and internal quotation marks omitted). Our caselaw further recognizes "that a divorce action involving multiple states is 'divisible.' That is, a divorce action involving one resident party and one foreign party may or may not be able to adjudicate personal rights, though it can sever a marriage as long as at least one party is a resident of that state." *Id.* at 601 (¶27). In addition,

7

"Mississippi law is clear that where the case in the foreign court is not decided on its merits, while suit might be barred from any other court in the state where the judgment was rendered[,] it is not res judicata in Mississippi." *Weiss v. Weiss*, 579 So. 2d 539, 541 (Miss. 1991) (internal quotation mark omitted).

¶16.  Here, Ellis contends the chancellor erroneously found that North Carolina did not possess personal jurisdiction over him.  We agree with Ellis that the record reflects he voluntarily submitted to North Carolina's personal jurisdiction when he entered a general appearance in the divorce proceeding.  Our analysis therefore focuses on Ellis's arguments that North Carolina statutory law required Lisa to raise equitable distribution in the divorce proceeding there and that her failure to do so barred her from asserting the issue in a subsequent action in Mississippi.  Ellis relies on North Carolina General Statute Annotated section 50-11(e) (2013), which provides:

> An absolute divorce obtained within this State shall destroy the right of a spouse to equitable distribution under [North Carolina General Statute Annotated section] 50-20 unless the right is asserted prior to judgment of absolute divorce; except, the defendant may bring an action or file a motion in the cause for equitable distribution within six months from the date of the judgment in such a case if service of process upon the defendant was by publication pursuant to . . . [North Carolina General Statute Annotated section] 1A-1, Rule 4 and the defendant failed to appear in the action for divorce.

¶17.  The North Carolina divorce judgment adjudicated three matters.  The divorce decree granted the parties an absolute divorce under North Carolina law, allowed Lisa to resume the use of her maiden name, and allowed Lisa's attorney to withdraw from the case.  No dispute exists that Lisa's North Carolina divorce complaint never raised the issue of equitable distribution and that the matter was therefore neither litigated in nor adjudicated by the North

8

Carolina divorce proceeding. Lisa argues, however, that the North Carolina court lacked in rem jurisdiction to dispose of the parties' property located outside the state. For this reason, Lisa asserts that she did not attempt to raise the issue in the divorce proceeding and that her failure to do so poses no bar to her current Mississippi action. To support her argument, Lisa cites North Carolina General Statute Annotated section 50-11(f), which states:

> *An absolute divorce by a court that* lacked personal jurisdiction over the absent spouse or *lacked jurisdiction to dispose of the property shall not destroy the right of a spouse to equitable distribution under* [*section*] *50-20 if an action or motion in the cause is filed within six months after the judgment of divorce is entered*.

(Emphasis added).

¶18. As the United States Supreme Court has previously recognized:

> [W]hen claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction. . . . The State's strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property would also support jurisdiction, as would the likelihood that important records and witnesses will be found in the State.

*Shaffer v. Heitner*, 433 U.S. 186, 207-08 (1977) (footnotes omitted).

¶19. As we have already noted, Mississippi recognizes divisible divorce actions. *Lofton*, 924 So. 2d at 601 (¶27). Here, during the North Carolina divorce proceeding, neither party ever raised the issue of equitable distribution of their marital property located in Mississippi. Further, as reflected by its decree, the North Carolina court never addressed the issue. Normally, under North Carolina statutory law, a party's failure to raise equitable distribution waives the issue in a future proceeding. N.C. Gen. Stat. Ann. § 50-11(e). But as the North

Carolina Supreme Court has recognized, exceptions do exist. "Chapter 50 clearly contemplates the survival of those rights [to equitable distribution and alimony] under certain circumstances[,]" and section 50-11(f) provides an exception that "applies to cases wherein the trial court lacks personal jurisdiction over the defendant or jurisdiction to dispose of the property." *Stegall v. Stegall*, 444 S.E.2d 177, 179, 180 (N.C. 1994).

¶20. We believe that such circumstances exist in the instant case. Because the North Carolina court never exercised jurisdiction to dispose of the parties' marital property, the grant of divorce did not destroy Lisa's right to equitable distribution under section 50-11(f) because she filed such an action within six months of the entry of divorce. We therefore find no error in the chancellor's determination that res judicata failed to bar Lisa's action in Mississippi. Accordingly, we find that Ellis's argument as to this assignment of error lacks merit.

## II. Equitable Distribution

¶21. With regard to the chancellor's actual distribution of the marital estate, Lisa argues the chancellor manifestly erred by classifying TEI and its assets as nonmarital property. The chancellor determined that Ellis acquired the TEI stock as a gift from his father. Lisa contends, however, that the stock fails to satisfy the requirements for a gift. She further asserts the stock is marital property because Ellis acquired it during their marriage through a corporate issuance of shares. In addition, even if this Court finds Senior gave the stock to Ellis as a gift, Lisa claims that TEI and its assets later became marital property through commingling and through Lisa's contributions to the accumulation of marital assets.

10

Arguing that the chancellor's improper classification of the stock resulted in an inequitable distribution of the marital estate, Lisa asks this Court to reverse the chancellor's judgment as to this issue and to remand for further proceedings.

¶22. "This Court employs a limited standard of review of property division and distribution in divorce cases." *Parrish v. Parrish*, 245 So. 3d 519, 522 (¶5) (Miss. Ct. App. 2017). When supported by substantial evidence, we leave the chancellor's opinion undisturbed unless the chancellor abused her discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard. *Id.* As previously discussed, we review questions of law de novo. *Id.*

¶23. "In ordering an equitable distribution, chancellors are directed to (1) classify the parties' assets as marital or separate, (2) determine the value of those assets, and (3) divide the marital estate equitably based upon the factors set forth in *Ferguson*[ *v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994)]." *Weaver v. Weaver*, 247 So. 3d 374, 376 (¶7) (Miss. Ct. App. 2018). "The law presumes that all property acquired or accumulated during marriage is marital property." *Stroh v. Stroh*, 221 So. 3d 399, 409 (¶27) (Miss. Ct. App. 2017) (citing *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994)). A spouse claiming that certain assets are separate, nonmarital property may rebut the presumption by proving that the disputed "assets are attributable to . . . [his or her separate estate] prior to the marriage or outside the marriage." *Id.* For instance, "[p]roperty acquired in a spouse's individual capacity through an inter-vivos gift or inheritance is separate property, even if such property is acquired during the marriage." *Rhodes v. Rhodes*, 52 So. 3d 430, 441 (¶40) (Miss. Ct.

11

App. 2011). To establish the receipt of a valid inter-vivos gift, a party must prove the following by clear and convincing evidence: (1) "the donor was competent to make a gift"; (2) "the donation was a voluntary act[,] and the donor had donative intent"; (3) "the gift must be complete and not conditional"; (4) "delivery was made"; and (5) "the gift was irrevocable." *West v. Johnson* (*In re Estate of Johnson*), 237 So. 3d 698, 705 (¶16) (Miss. 2017).

¶24. In determining that Ellis acquired his TEI stock as a gift and classifying TEI and its assets as nonmarital property, the chancellor relied on testimony not only from Ellis but also from Lisa; the parties' oldest son, Derek; Goode; and another tenant named Kenny Ellerbe. The testimony from these witnesses touched on each element necessary for a valid inter-vivos gift and supported a finding that each element was met. Substantial credible evidence showed that Senior freely and voluntarily signed the deed that conveyed land to TEI; that Senior intended the transfer of stock to Ellis and his brother, Mark, to be a gift; that Senior was competent both at the time the initial stock transfer occurred and at the time he surrendered his shares of stock back to TEI; that Ellis paid no compensation for any of the TEI stock he received; and that the gift was complete and irrevocable after being made.

¶25. In addition, substantial credible evidence supported the chancellor's findings that Lisa did not actively participate in or contribute to TEI, its business decisions, or its business operations; that TEI purchased its real property and equipment using funds and/or loans obtained solely from TEI itself; and that TEI's assets were nonmarital and were never converted into or commingled with marital property. Ellis testified that no marital assets

12

were used to purchase TEI's real property and that none of his or Lisa's income ever went into TEI. Ellis further testified that TEI's expenses were paid through income generated from TEI's hunting and farming leases. During her own testimony, Lisa confirmed that she was never a stockholder in TEI and that she never held any responsibility for TEI's loans or debt. Multiple witnesses further stated that Lisa did take part in any of TEI's business operations and that she rarely even set foot on TEI's property other than for certain social events.

¶26. Upon review, we find that sufficient evidence supports the chancellor's determinations that Ellis received the TEI stock as a gift and that TEI and its assets remained Ellis's separate property. We therefore cannot say that the chancellor manifestly erred by classifying TEI and its assets as nonmarital property. As a result, we also decline to find an inequitable distribution of the marital estate based on the chancellor's classification of TEI and its assets as Ellis's separate property.

## CONCLUSION

¶27. We find no error in the chancellor's determination that res judicata failed to bar Lisa's complaint for equitable distribution. Further, upon considering the chancellor's equitable distribution of the marital estate, we find no error in her classification of TEI and its assets as nonmarital property. We therefore affirm the chancellor's judgment.

¶28. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. J. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND C. WILSON, J.**

13

**J. WILSON, P.J., DISSENTING:**

¶29.	I would hold that Ellis was entitled to a dismissal of Lisa's complaint for equitable distribution because the Full Faith and Credit Clause requires our State's courts to give res judicata effect to the North Carolina judgment granting an absolute divorce. Therefore, I would reverse and render a judgment of dismissal on Ellis's cross-appeal.

¶30.	North Carolina General Statute section 50-11(e) provides:

> An absolute divorce obtained within this State shall destroy the right of a spouse to equitable distribution under [section] 50-20 unless the right is asserted prior to judgment of absolute divorce; except, the defendant may bring an action or file a motion in the cause for equitable distribution within six months from the date of the judgment in such a case if service of process upon the defendant was by publication . . . and the defendant failed to appear in the action for divorce.

N.C. Gen. Stat. Ann. § 50-11(e) (2013).

¶31.	In this case, Lisa obtained an absolute divorce in North Carolina. The exception that follows the semicolon in section 50-11(e) does not apply because Ellis was served with a copy of the summons and complaint, appeared in the action, and admitted all facts required for an absolute divorce under North Carolina law. Therefore, because Lisa failed to assert a claim to equitable distribution prior to the judgment of absolute divorce, the judgment "destroy[ed]" her right to equitable distribution. *Id.*[3]

---

[3] Lisa filed a prior complaint for divorce in Mississippi, which may have included a claim for equitable distribution, although the complaint from the first Mississippi action does not appear to be part of the record in this case. However, Lisa obtained a dismissal without prejudice of the first Mississippi action *before* she obtained an absolute divorce in North Carolina. Under North Carolina law, a claim for equitable distribution that is voluntarily dismissed before entry of a judgment of absolute divorce does *not* preserve a claim for equitable distribution. *Rhue v. Pace*, 598 S.E.2d 662, 667 (N.C. Ct. App. 2004) (citing *Stegall v. Stegall*, 444 S.E.2d 177, 181 (N.C. 1994)).

14

¶32.    The Full Faith and Credit Clause, U.S. Const. Art. IV, § 1, as implemented by Congress, 28 U.S.C. § 1738, requires the courts of each State to give full faith and credit to an out-of-state divorce decree. *See, e.g.*, *Johnson v. Muelberger*, 340 U.S. 581, 587 (1951). In addition, "[f]ull faith and credit . . . generally requires every State to give to a judgment at least the res judicata effect which the judgment would be accorded in the State which rendered it." *Durfee v. Duke*, 375 U.S. 106, 109 (1963). Therefore, we must give the North Carolina judgment at least the res judicata effect that it would have in North Carolina. That is, we are required to recognize that the North Carolina judgment "destroy[s]" Lisa's right to equitable distribution. N.C. Gen. Stat. Ann. § 50-11(e).

¶33.    The majority argues that we are not required to give full res judicata effect to the North Carolina judgment because a divorce decree is "divisible." However, the cases that the majority cites do not permit us to ignore the res judicata effect of a valid foreign judgment. In *Weiss v. Weiss*, 579 So. 2d 539 (Miss. 1991), the Court held that a party could pursue alimony in Mississippi after the entry of a Louisiana divorce decree because the Louisiana decree clearly and specifically preserved her right to litigate her claim for alimony at a later date. *Id.* at 540-41. In *Pierce*, *supra*, the Court held that a party could pursue equitable distribution and alimony in Mississippi after the entry of a Washington divorce decree because "the Washington court held that it lacked personal jurisdiction" over her and, therefore, lacked jurisdiction to award alimony or divide the marital estate. *Pierce*, 132 So. 3d at 557-58, 561 (¶¶1, 3, 6, 19).[4] Similarly, in *Lofton v. Lofton*, 924 So. 2d 596 (Miss. Ct.

---

[4] This holding is consistent with on-point United States Supreme Court precedent. *See Estin v. Estin*, 334 U.S. 541, 548-49 (1948).

15

App. 2006), this Court held that a party could pursue alimony after the entry of a Florida divorce decree because the Florida court lacked personal jurisdiction over her and, therefore, lacked jurisdiction to award alimony. *Id.* at 602-04 (¶¶33-40).[5]

¶34. In this case, the North Carolina court clearly had personal jurisdiction over both Lisa and Ellis, and the court's judgment did not purport to preserve Lisa's right to pursue equitable distribution at a later date. Rather, the North Carolina court granted a standard "absolute divorce" without any reservation, and we must give the judgment its ordinary res judicata effect under North Carolina law. *Durfee*, 375 U.S. at 109. Therefore, the judgment bars Lisa's claim for equitable distribution. N.C. Gen. Stat. Ann. § 50-11(e).

¶35. The Constitution's Full Faith and Credit Clause "altered the status of the States as independent sovereigns. It ordered submission by one State even to hostile policies reflected in the judgment of another State, because the practical operation of the federal system, which the Constitution designed, demanded it." *Estin*, 334 U.S. at 546 (citation omitted). We cannot deny full faith and credit to a valid judgment entered in another State based solely on our own state law on the nature or "divisibility" of a divorce decree. *See id.* at 545-46 ("The Full Faith and Credit Clause is not to be applied, accordion-like, to accommodate our personal predilections."). In this case, the North Carolina court had jurisdiction over the parties and entered a valid judgment, and the North Carolina judgment "destroy[s]" any subsequent claim for equitable distribution. The Full Faith and Credit clause requires us to

---

[5] In *Lofton*, the Mississippi court had entered an order requiring the husband to pay separate maintenance prior to the entry of the Florida divorce decree, and the ex-wife had petitioned the Mississippi court to convert the separate maintenance award into an alimony award. *See id.* at 598 (¶¶4-8).

16

give the North Carolina judgment that effect.

¶36.   The majority also asserts that section 50-11(f) provides an exception to section 50-11(e).  *Ante* at ¶¶17, 19-21.  However, section 50-11(f) applies only when the court that granted the absolute divorce "lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property."  N.C. Gen. Stat. § 50-11(f).  In this case, Ellis was served and filed an answer in the North Carolina action.  He was not "absent," and the North Carolina court clearly had personal jurisdiction over both parties.  Moreover, the majority fails to explain why the North Carolina court would have lacked jurisdiction to dispose of any marital property.  North Carolina law specifically provides that "[r]eal or personal property located outside of North Carolina is subject to equitable distribution . . . , and the court may include in its order appropriate provisions to ensure compliance with the order of equitable distribution."  N.C. Gen. Stat. § 50-21(a).  Section 50-11(f) does not apply.

¶37.   Citing section 50-11(e), the majority actually acknowledges that "[n]ormally, under North Carolina statutory law, a party's failure to raise equitable distribution waives the issue in a future proceeding."  *Ante* at ¶19.  However, the majority then argues that the normal rule does not apply in this case *because the parties failed to pursue equitable distribution* in the North Carolina proceeding.  *Ante* at ¶¶20-21.  If section 50-11(e) does not apply whenever the parties fail to raise the issue of equitable distribution in the original divorce proceeding, when does it ever apply?  The majority's reasoning renders the statute meaningless.

¶38.   The majority ultimately confuses two different concepts.  The fact that "the North Carolina court never exercised jurisdiction to dispose of the marital property" (*ante* at ¶21)

17

does not mean that the court "lacked jurisdiction" to do so under section 50-11(f). The North Carolina court did not divide the marital property only because Lisa failed to assert a right to equitable distribution prior to the entry of judgment. Her failure to assert that right is not an *exception* to section 50-11(e). Rather, it is *the reason* that section 50-11(e) applies. Lisa's right to equitable distribution was "destroy[ed]" *precisely because* she failed to place the issue before the North Carolina court. That is the whole point of the statute.

¶39. For the foregoing reasons, I would hold that the North Carolina judgment bars Lisa's claim for equitable distribution. Therefore, on Ellis's cross-appeal, I would reverse and render a judgment dismissing Lisa's complaint. I respectfully dissent.

**BARNES, C.J., AND C. WILSON, J., JOIN THIS OPINION.**